119 A.3d 255

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Shonda WALTER, Appellant.**

Supreme Court of Pennsylvania.

Submitted May 2, 2014.

Decided July 20, 2015.

176

Christian David Frey, Esq., George Edward Lepley, Jr., Esq., Lepley, Engelman & Yaw, L.L.C., Williamsport, for Shonda Dee Walter.

James Patrick Barker, Esq., Susan Lynn DiGiacomo, Esq., Amy Zapp, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.

## *OPINION*

Justice TODD.

In this direct appeal *nunc pro tunc,* Appellant Shonda Walter challenges the May 26, 2006 judgment of sentence of death imposed by the Court of Common Pleas of Clinton County after a jury convicted her of first-degree murder and theft by unlawful taking.[1] For the following reasons, we affirm.

1. Appellant's notice of appeal indicates that she appeals from the November 29, 2011 order granting her relief pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541 *et seq.,* in the form of reinstatement of her right to file a direct appeal *nunc pro tunc* within 30 days of the order's entry. This is technically incorrect, as her *nunc pro tunc* appeal properly lies from the May 26, 2006 judgment of sentence. However, as Appellant's appeal was timely filed, as the parties have proceeded as if she appealed from the judgment of sentence, and as foreclosing review on the basis of her procedural misstep would likely result in further proceedings reinstating her right to file an appeal from the judgment of sentence of death *nunc pro tunc,* we treat her appeal from the PCRA court's order as one from the judgment of sentence. Pa.R.A.P. 105(a) (permitting appellate courts to disregard the Rules of Appellate Procedure for good cause or in the interest of judicial efficiency).

## I. FACTUAL AND PROCEDURAL HISTORY

On March 29, 2003, Rhoda Powers called the Lock Haven Police Department and reported to Officer Thomas Winter that she had not seen or heard from her brother, 83–year–old Lock Haven resident James Sementelli, in several days, and that she was concerned for his welfare. Shortly thereafter, Officer Winter visited Sementelli's home, where, *inter alia*, he noticed that Sementelli's Toyota Camry was absent from the carport. Officer Winter issued a "be-on-the-lookout" bulletin for the car, and, the next day, officers in nearby Williamsport discovered Aaron Jones driving the vehicle. The officers initiated a traffic stop, and, under the guise of investigating an obscured vehicle registration or inspection sticker, questioned Jones as to how he had obtained the car. Jones indicated that a woman named Shonda owned the car and had allowed him to use it. Ultimately, the officers released Jones but seized the car.

The next evening, one of Jones' friends, Shanee Gaines, called Lycoming County emergency services and reported that Appellant, who lived near Sementelli, had murdered him with a hatchet in an effort to steal and sell his car. The dispatchers relayed the report to Lock Haven police, who forced entry into Sementelli's home and discovered his body, apparently murdered six days prior in a brutal hatchet attack wherein he sustained numerous blunt and sharp force trauma wounds, fractures, and bruises, as well as a near-severed left ear and a punctured eye.

Police interviewed Gaines, who gave a lengthy statement implicating Appellant as Sementelli's assailant. According to Gaines, on March 23, 2003, she was babysitting for Michelle Mathis, a mutual friend of Appellant and Gaines, when Appellant came to Mathis' home in Sementelli's car and approached the door with blood on her face and hands. Gaines said that Appellant asked for Mathis, that Gaines let Appellant come into the home and shower, and that, when Mathis returned, the women went back to the crime scene, where Appellant cleaned up evidence and stole, *inter alia*, a plastic container of

coins and some DVDs. Thereafter, Gaines indicated, the women left Lock Haven, discarded the murder weapon on a rural road, attempted to exchange the coins for currency, and returned to Mathis' home, where they smoked marijuana and watched some of the DVDs. Over the next two days, Gaines claimed, Appellant and several others—including Jones, Gaines, Mathis, and Jones' cousin Emma Thompson—took two trips to the Philadelphia region in an attempt to sell the car, but to no avail.

In the early morning hours of April 1, 2003, Appellant was arrested and charged *inter alia,* with first-degree murder, 18 Pa.C.S. § 2502(a), and theft by unlawful taking, 18 Pa.C.S. § 3903(a.1). Appellant proceeded to arraignment, where the Magisterial District Court appointed Public Defender Stephen C. Smith as counsel. Upon reaching the trial court, the matter was assigned to then-Judge J. Michael Williamson. On June 16, 2003, the Commonwealth filed notice of its intent to seek the death penalty, citing the aggravating circumstance that the murder occurred in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6)—*i.e.,* the theft of Sementelli's car. On September 11, 2003, the trial court appointed James Bryant, Esq., as co-counsel.

On November 17, 2003, Appellant filed documents styled "Motion to Dismiss Alleged Aggravating Circumstances" and "Petition for Writ of *Habeas Corpus* With Respect To Count V," which was the charge of theft by unlawful taking. After a hearing, on January 8, 2004, the trial court dismissed the motion and petition. On February 2, 2004, Appellant filed an application for a change of venue. On March 1, 2004, the trial court held a hearing on the application, but declined to issue a ruling.[2] On March 24, 2004, the trial court held another hearing, after which it opined that it would hold Appellant's application for a change of venue in abeyance unless and until it was unable to seat an unbiased jury.

**2.** Thereafter, Appellant filed several *pro se* documents with the court indicating her dissatisfaction with counsel and requested reappointment of counsel, which requests were ultimately denied. We detail these filings and proceedings below.

On April 15, 2004, the Commonwealth filed a motion to recuse Judge Williamson, noting, *inter alia,* that its extant theory was that Appellant had killed Sementelli to steal his car, in part, to use the proceeds to pay off fines Judge Williamson imposed on Appellant in an earlier criminal case, and suggesting it may have to call Judge Williamson as a witness at trial. On April 19, 2004, the trial court denied the motion to recuse. On April 23, 2004, the Commonwealth appealed the trial court's denial of its motion to recuse to the Superior Court.

During the pendency of the Commonwealth's appeal, on July 1, 2004, Attorneys Smith and Bryant filed a supplemental application for a change of venue. The next day, the trial court entered an order indicating it would schedule a hearing on the supplemental application upon remand from the Superior Court. On July 12, 2004, Appellant filed a second supplemental application for a change of venue. On November 1 and 3, 2004, and as discussed further below, Appellant filed documents styled "Defendant's Challenge to Capital Proceedings," and "Defendant's Amended Challenge to Capital Proceedings."

On December 22, 2004, the Superior Court reversed the trial court's order denying the Commonwealth's motion to recuse, and, on remand, the matter was reassigned to then-President Judge Richard N. Saxton, Jr.

On April 1, 2005, Appellant proceeded to *voir dire,* and, on April 11, 2005, to a jury trial, at which the Commonwealth pursued the theory, consistent with Gaines' statement, that Appellant murdered Sementelli with a hatchet in order to steal his car and sell it to pay off her debts.[3] Appellant was convicted of first-degree murder and theft. On April 19, 2005, Appellant proceeded to a penalty-phase hearing, after which the jury found as an aggravating circumstance that the murder was committed in the perpetration of a felony, found no mitigating circumstances, and imposed a sentence of death.

---

**3.** On April 12, 2005, the second day of trial, Appellant filed a document styled "Argument on Proffered Testimony of Proposed Defense Witness Frank Leroy Flippen."

On May 19, 2005, Appellant filed a post-sentence motion, which was subsequently denied.

Appellant timely appealed to this Court. We found the evidence sufficient to support her conviction for first-degree murder, found the balance of her claims to be moot, waived due to lack of development in her brief, or meritless, and found the jury's imposition of the death penalty was not the product of arbitrariness and was supported by at least a single aggravating circumstance, and so we affirmed the judgment of sentence of death. *Commonwealth v. Walter*, 600 Pa. 392, 966 A.2d 560 (2009).[4]

Appellant timely filed a PCRA petition, raising a claim that her appellate attorney had rendered ineffective assistance of counsel in failing to develop the arguments in her brief, as well as numerous other claims. On November 29, 2011, upon the Commonwealth and Appellant's consent, the PCRA court, by then-President Judge Williamson, granted relief, reinstating Appellant's right to file a direct appeal *nunc pro tunc* from the judgment of sentence of death, and thus declining to reach her other claims.[5]

4. In her appeal, Appellant claimed that (1) the trial court erred in denying her pretrial Motion to Dismiss Alleged Aggravating Circumstances; (2) the trial court erred in failing to grant her serial challenges to the capital proceedings on the ground that the death penalty was unconstitutional *per se* and as applied to her; (3) the Commonwealth failed to allege the requisite state of mind for the commission of murder; and (4) the jury failed to adequately consider mitigation evidence she presented at trial. This Court rejected Appellant's first claim on the ground that, regardless of whether the trial court had erred in denying her motion, the jury's determination that the aggravating circumstance existed rendered the issue moot. *See Walter*, 966 A.2d at 565. Next, we disposed of Appellant's challenges to the death penalty as previously rejected by this Court or waived due to lack of development in her brief. *Walter*, 966 A.2d at 566. We found Appellant's challenge to the sufficiency of the evidence was similarly waived for lack of development. *Id.* at 566–67. Finally, regarding Appellant's last claim, we noted that it is entirely the province of the jury to determine the existence and weight of mitigating factors. *Id.* at 567.

5. As noted, Appellant and the Commonwealth essentially stipulated to the PCRA court's order granting Appellant reinstatement of her right to file a direct appeal *nunc pro tunc* from the judgment of sentence of death, and the Commonwealth did not appeal that order. In his dissent, Chief Justice Saylor asserts that, because this stipulation was

not a "supported judicial finding that Appellant suffered a deprivation of her right to appellate counsel so severe as to be tantamount to a complete denial of counsel," Dissenting Opinion (Saylor, C.J.) at 240, 119 A.3d at 294, this Court now lacks jurisdiction to entertain Appellant's claims in this appeal.

Respectfully, we disagree. As an initial matter, although the dissent correctly points out that a PCRA court must determine that a petitioner has been functionally denied appellate counsel before reinstating her appellate rights *nunc pro tunc,* Dissenting Opinion (Saylor, C.J.) at 240, 119 A.3d at 294 (citing *Commonwealth v. Halley,* 582 Pa. 164, 870 A.2d 795, 800–01 (2005); *United States v. Cronic,* 466 U.S. 648, 659 & n. 25, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)), it cites no authority for its implicit proposition that the court's failure to do so renders an order granting reinstatement of appellate rights *nunc pro tunc* extrajurisdictional. Furthermore, the dissent's citations evincing that a lack of appellate jurisdiction is not waivable by the parties and may be considered *sua sponte* by a court, *see* Dissenting Opinion at 240 & n. 1, 119 A.3d at 294 & n. 1 (citing *Commonwealth v. Saunders,* 483 Pa. 29, 394 A.2d 522, 524 (1978); *Commonwealth ex rel. Ransom Twp. v. Mascheska,* 429 Pa. 168, 239 A.2d 386, 387 (1968)), are beside the point, as this Court has statutorily-provided exclusive appellate jurisdiction over appeals, like the instant one, from death sentences. 42 Pa.C.S.A. §§ 722; 9711(h) (providing this Court exclusive appellate jurisdiction over appeals from judgments of sentences of death).

Here, Appellant filed a timely PCRA petition, vesting the PCRA court with the jurisdiction to grant PCRA relief. *See* 42 Pa.C.S. § 9545; *accord Commonwealth v. Peterkin,* 554 Pa. 547, 722 A.2d 638, 641 (1998) (noting that, where a petitioner filed an *untimely* PCRA petition, the PCRA court lacked jurisdiction to grant PCRA relief); *Commonwealth v. Bennett,* 842 A.2d 953 (Pa.Super.2004) (holding that, where a petitioner filed an *untimely* PCRA petition, the PCRA court lacked jurisdiction to reinstate appellate rights *nunc pro tunc,* and quashing the appeal). The PCRA court entered an order granting relief—reinstatement of Appellant's appellate rights *nunc pro tunc*—and, because the Commonwealth did not challenge that order, it became final and effective 30 days later. *See* 42 Pa.C.S. § 5505; *Commonwealth v. Robinson,* 575 Pa. 500, 837 A.2d 1157, 1162 (2003) (explaining that a PCRA court's order granting relief, left unchallenged, becomes final and effective 30 days after its entry and that neither the PCRA court nor an appellate court retains jurisdiction "to tinker with that final judgment"). Yet, the dissent finds the within appeal without jurisdiction because of the basis for the PCRA court's order granting relief—the parties' stipulation.

The dissent, it would appear, conflates the *rationale* for the PCRA court's order with its *jurisdiction* to grant relief—here, reinstatement of direct appellate rights. The dissent's view runs counter to longstanding rules concerning the finality of judgments and appellate jurisdiction, would provide the Commonwealth endless opportunities to collaterally attack a PCRA court's order it declined to appeal, and would provide this Court a right (and perhaps an obligation) to examine the propriety of already final orders granting *nunc pro tunc* relief at all subsequent stages of post-conviction litigation. Although we share the dissent's

Appellant timely appealed to this Court, raising ten issues, and, after an initial round of briefing, this Court entered an order noting that the trial court had not prepared an opinion in support of its decision to grant Appellant a new direct appeal *nunc pro tunc* or an opinion concerning Appellant's issues on appeal, and directing it to do so. On May 9 and 23, 2013, the trial court, by now-Senior Judge Williamson, issued opinions detailing its grant of relief and indicating that an opinion should be prepared by now-Senior Judge Saxton. On June 20, 2013, we entered an order directing Senior Judge Saxton to prepare such an opinion. Subsequently, Senior Judge Saxton complied, and, on May 2, 2014, the matter was submitted on the briefs for disposition.

## II. ANALYSIS[6]

### A. Denial of Requests for Replacement of Appointed Counsel

In her first issue, Appellant argues the trial court erred in denying her serial requests for replacement of appointed counsel on the ground that the court's decision violated her Sixth Amendment right to counsel free from conflicts of interest.

apparent concern that the PCRA court's piecemeal adjudication of Appellant's claims may have resulted in unnecessary delay, we decline to abandon longstanding principles of order finality and appellate jurisdiction to avoid such delay, and, instead, rely on the adversarial process as a check against it. While that process may have faltered in this case, our jurisdiction is sound.

6. As an initial matter, we note that, in the context of Appellant's initial direct appeal, we conducted our mandatory, independent review of the sufficiency of the evidence supporting her conviction of first-degree murder, *see Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102, 114 (2004), and found the evidence "amply supported the jury's verdict." *Walter*, 966 A.2d at 563. Additionally, we conducted our statutory review of Appellant's death sentence, *see* 42 Pa.C.S. § 9711(h)(3), finding it was not "triggered by an improper factor" and that the evidence "was sufficient to support the jury's finding" that the murder was "committed while in the perpetration of a felony." *Walter*, 966 A.2d at 568. Appellant does not presently provide any basis to revisit these determinations.

On March 10, 2004, Appellant sent a pro se letter to the trial court requesting replacement of appointed counsel. Therein, she identified essentially three complaints concerning counsel's stewardship: (1) counsel had spoken with and disclosed information concerning her case with another inmate; (2) counsel had left her discovery material with prison officials, where it was accessible to third parties; and (3) counsel failed to adequately communicate with her. On March 15, 2004, the trial court held a hearing on the matter, at which it inquired of counsel with respect to each of Appellant's concerns. Regarding confidentiality, Attorney Smith indicated that he had interviewed the inmate, and, although counsel had provided "background" regarding Appellant's case, he had not disclosed any of Appellant's confidential statements. N.T. Pretrial Hearing, 3/15/04, at 4. Regarding Appellant's discovery, Attorney Smith indicated he was unable to determine whether Appellant's discovery material had been accessible to third parties, but, in any event, the information was a matter of public record, and that he would remove Appellant's discovery from the jail in accordance with her wishes. Finally, regarding communication, Attorneys Smith and Bryant indicated that, although they frequently attempted to contact and meet with Appellant, she refused to meet with them. Ultimately, the trial court denied Appellant's request for replacement of counsel.

Appellant wrote another letter to the trial court, wherein she reasserted her problems with counsel's representation. Appellant also wrote a letter to President Judge Saxton, in which she reiterated her complaints, purported to appeal Judge Williamson's decision, and attached a *pro se* motion for replacement of appointed counsel. On March 24, 2004, the trial court held another hearing, where it again addressed Appellant's concerns in detail and denied Appellant's request for replacement of appointed counsel.

On April 20, 2004, Attorneys Smith and Bryant filed a petition to withdraw, wherein they indicated that Appellant refused to speak with them or participate in the preparation of

her defense. On July 1, 2004, however, they filed a praecipe withdrawing the petition.

Before us, Appellant contends that her problems with Attorneys Smith and Bryant were so grave as to constitute conflicts of interest, and, therefore the court's decision denying her requests violated her Sixth Amendment right to conflict-free counsel, as recognized in *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); and *Wood v. Georgia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). Appellant contends the alleged conflict of interest led counsel to provide ineffective representation, observing, *inter alia,* that counsel failed to give an opening statement at her trial, failed to significantly cross-examine several Commonwealth witnesses, conceded her guilt, gave a nearly incomprehensible closing argument, and filed an inadequate appellate brief before this Court in the context of her initial direct appeal. *See* Appellant's Brief at 15–16.

The Commonwealth and the trial court respond, in pertinent part, that the *Holloway* line of decisions implicates only conflicts of interest, and not, as Appellant asserts, conflicts between an accused and her counsel regarding the adequacy of the representation. *See* Commonwealth's Brief at 10; Trial Ct. Op., 9/24/13, at 5.

█ Upon review, we agree. A review of the *Holloway* line of decisions demonstrates that the Sixth Amendment right to counsel free from conflicts of interest, at least as explicated in *Holloway, Cuyler,* and *Wood,* involves conflicts of interest arising from counsel's active representation of multiple clients with diverging interests, not interpersonal conflicts between counsel and client causing inadequate representation at trial. As the high Court explained:

> As a general matter, a defendant alleging a Sixth Amendment violation must demonstrate [prejudice]. . . .
>
> There is an exception to this general rule ... when the defendant's attorney actively represented conflicting interests.

In [*Holloway*], defense counsel had objected that he could not adequately represent the divergent interests of three codefendants....

In [*Cuyler*] the respondent was one of three defendants accused of murder who were tried separately, represented by the same counsel....

Finally, in [*Wood*], three indigent defendants convicted of distributing obscene materials had their probation revoked for failure to make the requisite $500 monthly payments on their $5,000 fines. We granted certiorari to consider whether this violated the Equal Protection Clause, but during the course of our consideration certain disturbing circumstances came to our attention: ... [T]he defendants had been represented by the lawyer for their employer (the owner of the business that purveyed the obscenity), and their employer paid the attorney's fees. The employer had promised his employees he would pay their fines, and had generally kept that promise but had not done so in these defendants' case. This record suggested that the employer's interest in establishing a favorable equal-protection precedent (reducing the fines he would have to pay for his indigent employees in the future) diverged from the defendants' interest in obtaining leniency or paying lesser fines to avoid imprisonment.

*Mickens v. Taylor*, 535 U.S. 162, 166–69, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002).

In her requests to the trial court, Appellant identified no complaint concerning Attorney Smith's or Attorney Bryant's active representation of another client with conflicting interests, and instead relies upon her dissatisfaction with counsel's strategy and performance. As such, *Holloway*, *Cuyler*, and *Wood* are inapposite,[7] and Appellant is not entitled to relief with respect to her first issue.

7. Appellant also baldly asserts, without argument, that the trial court's denial of her requests for replacement counsel violated her rights pursuant to the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 9, 13, and 25 of the Pennsylvania Constitution. Appellant's Brief at 9. As she offers nothing more than bare assertions of her entitlement to relief, we find these claims to be waived. *Commonwealth v. Steele*, 599 Pa. 341, 961 A.2d

## B. Admission of Testimony That Appellant Failed to Deny Charges Against Her

█ In her second issue, Appellant asserts that the Commonwealth committed prosecutorial misconduct in eliciting, and the trial court erred in admitting, testimony that she failed to deny the charges against her, on the ground that it exploited her exercise of the federal and state constitutional privilege against self-incrimination.

In its case-in-chief, the Commonwealth called Appellant's mother, Judith Walter, to the stand, and asked her, *inter alia*, about a post-arrest phone call between them:

[COMMONWEALTH:] You talked to her on the telephone?

[JUDITH WALTER:] Yes.

[COMMONWEALTH:] And at that time did you explain to her or tell her what you knew of the charges against her?

[JUDITH WALTER:] Yes.

[COMMONWEALTH:] And did she ever deny the charges against her to you?

[ATTORNEY SMITH:] Objection, Your Honor. I believe the best evidence in this would be the replaying of the telephone conversation. He may—

[COMMONWEALTH:] That's exactly not the best evidence.

THE COURT: Overruled. You may answer the question.

786, 797 (2008). Additionally, in her reply brief and supplemental brief, Appellant recasts her claim, contending that her differences with counsel resulted in a complete breakdown of their relationship, implicating, *inter alia*, this Court's decision in *Commonwealth v. Tyler*, 468 Pa. 193, 360 A.2d 617 (1976) (holding that an accused's good-faith assertion of irreconcilable differences with trial counsel as to trial strategy warrants replacement of appointed counsel). Appellant's Reply Brief at 2–6; Appellant's Supplemental Brief at 3–5. As Appellant raises this novel claim for the first time before us in her reply and supplemental briefs, this claim is also waived. *See Commonwealth v. Wharton*, 571 Pa. 85, 811 A.2d 978, 990 (2002).

[JUDITH WALTER]: She was—seemed like she was still out of it. She just didn't—she didn't know. She didn't know.

N.T. Trial, 4/11/05, at 145.

Appellant contends the Commonwealth's question eliciting and the trial court's admission of her mother's testimony concerning whether she denied the charges against her violated decisions of the United States Supreme Court and this Court's holding that the Commonwealth may not use an accused's exercise of her privilege against self-incrimination as evidence of her guilt. Appellant's Brief at 17–18 (citing, *inter alia, Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Commonwealth v. Turner,* 499 Pa. 579, 454 A.2d 537 (1982)). As demonstrated above, Appellant's counsel objected to the Commonwealth's question and to her mother's testimony on the ground that her mother's testimony was not the best evidence that she failed to deny the charges against her, but made no objection on the ground that it exploited her exercise of the privilege against self-incrimination. Accordingly, her present claim is waived. *See Commonwealth v. Rivera,* 603 Pa. 340, 983 A.2d 1211, 1229 (2009) (noting a claim of prosecutorial misconduct must be preserved by contemporaneous objection); Pa.R.E. 103(a)(1) (providing that a party seeking to claim error in a ruling to admit evidence must make a "timely objection, motion to strike, or motion *in limine*" and "states the specific ground, unless it was apparent from the context").[8]

8. Appellant contends, without citation to legal authority, that her counsel's failure to object on the ground that the Commonwealth's question elicited testimony that exploited her exercise of the privilege against self-incrimination should not constitute waiver of the claim because, during the objection, the Commonwealth interrupted her counsel. Appellant does not offer, nor do we discern, any reason the interruption precluded her counsel from subsequently making an objection on the ground that the testimony exploited her exercise of the privilege against self-incrimination. Appellant also asserts, again without argument, that the Commonwealth's questions and the trial court's admission of Judith Walter's testimony violated her rights under the Sixth Amendment to the United States Constitution and Article I, Sections 1, 13, and 25 of the Pennsylvania Constitution. Appellant's Brief at 16. As Appellant

## C. Admission of Testimony Implicating Appellant and Exculpating Michelle Mathis

In her third issue, Appellant argues the trial court erred in admitting Shanee Gaines' testimony suggesting that she planned Sementelli's murder and was on probation at the time of the crime—and which tended to discount her potential defense that Michelle Mathis was the real killer—on the ground that the testimony was inadmissible hearsay, and violated her federal and state constitutional rights to confront the witnesses against her, the Fourteenth Amendment guarantee of due process of law, and the Eighth Amendment.

During Gaines' testimony, the Commonwealth inquired as to Gaines' relationship with Appellant and her recollection of the events of the date of the murder:

[COMMONWEALTH:] [H]ow did you know [Appellant] or of [Appellant]?

[GAINES:] Through a mutual friend, Michelle Mathis.

\* \* \*

[COMMONWEALTH:] Okay. Now, I'm going to ask you about the events of the 25th of March of 2003 beginning in the morning hours, the earlier part of the day. Did you have a conversation with Michelle Mathis on that day?

[GAINES:] Yes.

[COMMONWEALTH:] Okay, what did she say to you?

[ATTORNEY SMITH:] Objection, hearsay.

[COMMONWEALTH:] It's not offered—it's offered for the purpose of the conversation taking place, Your Honor, not for the purpose of the truth of the matter asserted therein.

THE COURT: I guess whether or not a conversation took place is yes or no. Do we have to hear the conversation? What makes it not hearsay?

offers nothing in support of her claims in this regard, we find these claims to be waived. *Steele*, 961 A.2d at 797.

[COMMONWEALTH:] Because it's offered for this witness's state of mind, knowledge of what Michelle Mathis said, not for anything that is necessarily asserted therein. And it's relevant to later matters in testimony, as well.

THE COURT: We'll allow it.

[COMMONWEALTH:] What did Ms. Mathis say to you?

[GAINES:] She came over, and she said—she asked me—she wanted to know where to hide a body at. And I told her I didn't know. And I thought she was just playing. And she asked me again. I said, I don't know. And she said, well, some white girl [9] from Lock Haven is going to kill this old man for his car so she could sell his car because she was on probation and she had fines that she needed to pay. And she was going to sell his car to get the money.

[ATTORNEY SMITH:] Objection. Hearsay upon hearsay, Your Honor. I'm sorry, but—

THE COURT: Let me see counsel.

[at sidebar:] I really think that she has gone too far.

[COMMONWEALTH:] I'm not going to ask her anymore questions about the conversation.

THE COURT: All right.

[ATTORNEY BRYANT:] Got the genie out of the bottle.

THE COURT: I know.

[COMMONWEALTH:] I don't think so, Your Honor.

[ATTORNEY SMITH:] I'd ask for a minimum of some instruction, Judge. She's going to be—

\* \* \*

[COMMONWEALTH:] Fine, Your Honor. Thank you, Your Honor.

[THE COURT]: [To the jury:] Ladies and gentlemen, I want to tell you that part of this witness's response was

---

9. Appellant indicates she is "of mixed parentage" and that, "her mother, who testified at trial, is Caucasian," and asserts that because, she "was the only one implicated who was from Lock Haven or who was arguably 'white,'" "[i]t is clear, and would have been to the jury, that this was a reference to Appellant." Appellant's Brief at 21 n. 3.

impermissible as a matter of law. And I'm going to just simply ask you to forget and erase and not consider any answer that the witness has given to date concerning the last question that [the Commonwealth] asked. And I'll instruct him, and he knows, not to pursue that matter.

N.T. Trial, 4/11/05, at 148–51. The Commonwealth then asked Gaines about how she had come to be in Mathis' house on the night of the murder:

[COMMONWEALTH:] Did you see Michelle Mathis later that day?

[GAINES:] Yes.

[COMMONWEALTH:] Okay. And where was that?

[GAINES:] [A]t my house[.]

[COMMONWEALTH:] Okay. And at some point, did Ms. Mathis become involved in an altercation?

[GAINES:] Yes.

[COMMONWEALTH:] Where was that?

[GAINES:] In front of my house.

[COMMONWEALTH:] What happened there? Just tell us.

[GAINES:] A fight broke out. The fight was—they got into a fight. They finished the fight and went over to Michelle's house. And the cops were called. When the cops were called, the girl that Michelle had a fight with, her aunt knocked on the door and said that she should probably go to the hospital and get checked—

[ATTORNEY SMITH:] Objection. Hearsay again, Judge.

[COMMONWEALTH:] This is a different kind of statement, Judge.

THE COURT: I'll overrule it.

[GAINES:] Said that she should probably go get checked because the girl she was fighting had HIV. And I sat at the house and babysat Michelle's son while she went to the hospital.

N.T. Trial, 4/11/05, at 151–52.

In her brief, Appellant asserts that Gaines' testimony as to Mathis' statement tended to demonstrate that Appellant had

premeditated Sementelli's murder. She also contends that Gaines' testimony that the aunt of the woman Mathis fought with said the woman was HIV-positive discounted the potential defense that Mathis had perpetrated the murder by offering an alternative explanation for wounds that, she argues, Mathis might well have sustained in committing the crime. Appellant argues, without citation to legal authority or analysis, that both statements constituted inadmissible hearsay.

The Commonwealth, by contrast, submits that neither statement was inadmissible hearsay. First, with respect to Gaines' testimony that Mathis said "some white girl" from Lock Haven wanted to kill a man to steal and sell his car, the Commonwealth argues the testimony was not offered to establish the truth of Mathis' statement—i.e. whether, in fact, a woman from Lock Haven was planning a murder—but rather its effect on Gaines' subsequent behavior. In any event, the Commonwealth notes, Appellant's objection was sustained, and she requested a curative instruction, which the trial court gave. Next, with respect to Gaines' testimony regarding the aunt of the woman Mathis fought with, the Commonwealth again notes that the testimony was not offered to demonstrate its truth—i.e. whether the woman actually was HIV-positive—but rather to demonstrate its effect in prompting Mathis to visit the hospital, requiring Gaines to watch her children.

In its opinion, the trial court stated, in pertinent part, that Gaines' testimony was properly introduced to demonstrate her subsequent conduct and, in any event, that its curative instruction was sufficient to dispel any prejudice to Appellant's defense.

■ Generally speaking, hearsay is "a statement that ... the declarant does not make while testifying at the current trial or hearing; and ... [that] a party offers in evidence to prove the truth of the matter asserted in the statement" and is inadmissible at trial. Pa.R.E. 801; 802. First, regarding Gaines' testimony that Mathis told her that "some white girl" from Lock Haven wanted to kill a man to steal and sell his car,

we note that Appellant requested a cautionary instruction, which the trial court granted. Thus, the trial court in fact did *not* admit the objectionable statement into evidence, and affirmatively admonished the jury to disregard it, an admonishment this Court presumes effective. *See Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 721 (1998). As such, we reject Appellant's claim that the trial court erred in admitting the testimony or that its revelation caused her prejudice.

■ Next, regarding Gaines' testimony that the aunt of the woman Mathis fought with indicated the woman was HIV-positive, we agree with the Commonwealth and the trial court that the evidence was not hearsay, as it was not offered for the purpose of showing that the woman in fact was HIV-positive, but instead to show its effect on Mathis and Gaines— i.e., that Mathis left the home, leaving Gaines in care of her children, and went to the hospital. Accordingly, the trial court did not err in overruling Appellant's objection that the statement constituted hearsay.[10]

## D. Failure to Grant Application for a Change of Venue

In her fourth issue, Appellant claims that the trial court erred in failing to grant her serial applications for a change of venue.

As noted *supra*, on February 2, 2004, Appellant filed the first of three applications for a change of venue. Therein, she alleged, *inter alia*, that numerous articles in the Lock Haven Express ("Express"), a local newspaper of daily circulation, and the Renovo Record ("Record"), a local paper of weekly circulation, had "so inundated the potential juror pool that a fair and impartial jury selection process is unobtainable."

10. In her brief, Appellant also asserts that the Commonwealth's elicitation of the statements constituted prosecutorial misconduct, that the trial court's admission of the statements violated several of her constitutional rights, and that the trial court's curative instruction was inadequate to dispel the prejudice against her. As Appellant failed to preserve these objections at trial, they are waived. *See Rivera*, 983 A.2d at 1229; Pa.R.E. 103(a)(1); *Commonwealth v. Powell*, 598 Pa. 224, 956 A.2d 406, 421–22 (2008) (noting a party's failure to object to curative instruction waives challenge to the instruction for purposes of appeal).

196

Application for Change of Venue Pursuant to Criminal Rule of Procedure 578(6) ("Application"), 2/2/04, at 2. Appellant noted that the Express' and the Record's articles "brought to the attention of the public the fact that the petitioner/defendant admitted to the murder," were written in a "highly prejudicial and inflammatory" manner, reported on her character, and even reported that her trial would strain the county's budget, inviting the inference that it would cause a substantial tax increase. *Id.* Appellant further noted that the reports "revealed ... facts concerning [her] arrest along with photographs, details of the allege[d] crime, pictures of [Sementelli's] residence, along with many other facts and circumstance[s] and including the arrest and detention of the defendant[.]" *Id.* at 3. Appellant claimed that she was "unable to receive a fair and impartial trial within the County of Clinton and those Counties adjacent," and requested a change of venue to another county. *Id.*

On March 1, 2004, the trial court held a hearing on the matter, and, in pertinent part, the Commonwealth and Appellant stipulated to the admission of an affidavit from the Express' publisher, Robert O. Rolley, Jr. Therein, Rolley indicated, *inter alia*, that Appellant was the subject of numerous Express' articles, which he identified, and that, during the periods when the articles were published, the Express had approximately 9,400 subscribers. Due to an administrative difficulty, Appellant did not immediately furnish the identified articles to the trial court, but, with leave of court, the record was left open to permit her to do so. The trial court did not enter an order disposing of the application at that time. Subsequently, Appellant furnished the articles to the court.

On March 24, 2015, at another hearing, the trial court noted it would not rule on Appellant's application for a change of venue because, according to its extant policy, it held all such applications in abeyance unless and until it was unable to seat an unbiased jury. *See* N.T. Hearing, 3/24/04, at 2.

As noted above, on April 15, 2004, the Commonwealth filed a motion to recuse Judge Williamson, which, on April 19, 2004, the trial court denied. The Commonwealth appealed the trial

court's denial of its motion to recuse to the Superior Court, and, while that appeal was pending, on July 1 and July 12, Appellant filed two supplemental applications for a change of venue, adding more Express articles to the record. Thereafter, with the Commonwealth's appeal still pending, the trial court entered an order indicating it would address the applications upon remand, but, after the matter was remanded and reassigned to President Judge Saxton, neither the parties nor the court took any further action.

Before us, Appellant relies on this Court's intimation in *Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287, 291 (1978), that pretrial publicity may be so inflammatory and inculpatory in nature, and so sustained and pervasive in the community, that it may saturate the community with prejudice, and, regardless of the seated jurors' indications that they are not prejudiced against the accused, create a substantial likelihood that a fair trial cannot be had, requiring a change in venue. She contends that the pretrial publicity concerning her case was patently hostile and prejudicial to her, written in a manner slanted toward conviction, aroused sympathy for the victim, impugned her character, revealed her prior criminal record and admissions of guilt to the community, and, as noted above, at least implicitly suggested that her trial may cause the county's residents a tax increase. Appellant further submits that the articles at issue were part of a "barrage of . . . media coverage surrounding [her] case prior to trial" in a "small, tight knit community," Appellant's Brief at 29–31, and contends that the coverage created a prejudicial atmosphere which persisted throughout the proceedings, as evidenced by the fact that numerous venirepersons, including many of the seated jurors, indicated they had read or heard about the case and formed opinions prejudicial to her defense.

The Commonwealth, in its brief before this Court, assumes *arguendo* that the reports at issue are inherently inflammatory and inculpatory, but contends that, whatever their content, because Appellant was arrested two years prior to her trial, "there was ample time for any purported publicity to have dissipated." Commonwealth's Brief at 16.

Finally, in its opinion in Appellant's initial direct appeal, the trial court rejected Appellant's claims, offering the following:

**V. APPLICATION FOR CHANGE OF VENUE PURSUANT TO CRIMINAL PURSUANT TO CRIMINAL RULE OF PROCEDURE 578(6) FILED ON FEBRUARY 2, 2004, WHICH WAS DENIED WITHOUT A HEARING**

It is the policy of the Clinton County Court of Common Pleas to hold any requests for Change of Venue in abeyance until such time as the Court determines that a fair and impartial jury cannot be found. A jury was selected after questioning ninety-two jurors over the course of three days. Inasmuch as the Defendant did not even use five of the twenty peremptory challenges to which she was entitled, a change of venue was not necessary.

**VI. SUPPLEMENTAL CHANGE OF VENUE FILED ON JULY 12, 2004, WHICH WAS DISMISSED WITHOUT A HEARING**

This filing consisted of one letter to the editor in the Lock Haven Express dated July 5, 2004, which was nine months prior to the jury selection. The letter was written by relative of the victim who complained about statements made by two county commissioners concerning the cost of murder trials. The letter to the editor did not have anything damaging or prejudicial to say about the Defendant, and it did not have any effect on jury selection.

Trial Ct. Op., 10/12/06, at 3–4. In the instant appeal, the trial court reiterated its analysis in this regard. *See* Trial Ct. Op., 9/24/13, at 12–13.

■ In Pennsylvania, a trial court must grant a change of venue where "a fair . . . trial cannot otherwise be had in the county where the case is currently pending." Pa.R.Crim.P. 584(A). Ordinarily, an accused challenging a trial court's failure to grant a motion for a change of venue on the basis of pretrial publicity must demonstrate on the record that the publicity at issue caused one or more of the seated jurors to form a fixed opinion prejudicial to her defense. *Common-*

wealth v. Kichline, 468 Pa. 265, 361 A.2d 282, 287 (1976); *see also Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). However, as noted *supra,* we have recognized that pretrial publicity may be so inflammatory or inculpatory in nature, and so sustained and pervasive in the community, as to relieve the accused of her burden in this regard, whereupon, regardless of the seated jurors' indications that they could perform their duties fairly and impartially, this Court will presume prejudice and order retrial. *Casper,* 392 A.2d at 291; *see also Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).

In determining whether pretrial publicity is sufficiently inflammatory or inculpatory as to implicate this presumption, we have consistently looked to whether the publicity's content is likely to cause readers to become prejudiced against the accused, identifying as particularly suspect publicity which is "sensational, inflammatory, and slanted toward conviction, rather than factual and objective"; "reveal[s] the defendant's prior criminal record, if any[;]" "referred to confessions, admissions or reenactments of the crime by the defendant," or is "derived from official police or prosecutorial reports." *Commonwealth v. Briggs,* 608 Pa. 430, 12 A.3d 291, 314 (2011). In determining whether publicity is sustained and pervasive in the community, we have looked, *inter alia,* to the time between the publicity and trial, the nature and size of the community, opinion polling, and/or the statements of actual venirepersons as elicited during the jury selection process. *Casper,* 392 A.2d at 293; *Commonwealth v. Cohen,* 489 Pa. 167, 413 A.2d 1066, 1076 (1980); *Briggs,* 12 A.3d at 314–15. However, we have noted that, even where inflammatory or inculpatory publicity is disseminated in a sustained fashion and pervasively throughout the community, where that publicity is followed by a "cooling off" period sufficient to dissipate its prejudicial effect, a change of venue is unnecessary. *Briggs,* 12 A.3d at 314.

In reviewing a trial court's determination of whether pretrial publicity requires a change in venue, because the trial court "is in the best position to assess the atmosphere of the

community and to judge the necessity of any requested change," we reverse the determination only where it constitutes an abuse of discretion. *Briggs,* 12 A.3d at 313 (quoting *Commonwealth v. Tharp,* 574 Pa. 202, 830 A.2d 519, 529 (2003)).

Upon a careful review of the articles Appellant submitted to the trial court, their frequency and dissemination in the community, the nature of the community, and the jury selection proceedings, we conclude that, although the articles at issue were inherently inflammatory and prejudicial, and sustained and pervasive in the community, there was a "cooling off period" between the publicity submitted to the trial court and Appellant's trial sufficient to dispel any prejudice to her right to a fair trial.

■ First, regarding whether the articles at issue were inherently inculpatory or inflammatory, we note that, at virtually every stage of Appellant's prosecution, preceding and including her application for a change of venue, the Express and/or the Record published articles which were sensational in nature, revealed Appellant's prior criminal record, revealed Appellant's admissions to the crime, were derived from police or Commonwealth accounts of the crime, and/or otherwise served to foster bias against her in Clinton County.

On April 1, 2003, the date of Appellant's arrest, the Express began its coverage of her case with the first of myriad front-page articles, reporting on the discovery of Sementelli's body and on Appellant's arrest. *See* Jim Runkle, "City man 'murdered'," *Express,* Apr. 1, 2003 (Appellant's Brief app. at 145–46). The article, which juxtaposed photographs of Sementelli sitting in his home and Appellant in handcuffs being led by sheriff's deputies into an arraignment hearing, began by recounting the allegations and essential theory of the case announced at a joint police/Commonwealth press conference:

LOCK HAVEN—Lock Haven police say a senior citizen was killed for his car . . . by a neighbor woman who used a hatchet to attack him.

Murder charges have been filed against [Appellant] . . .

[Sementelli] ... was allegedly killed at his home, a short distance from [Appellant]'s residence.

"The two lived less than 100 feet away from each other," District Attorney Ted McKnight said. "They were essentially neighbors."

The details of the arrest were made public this morning at a press conference by McKnight and city police, who are investigating Sementelli's death.

*Id.* Thereafter, the article went on to report, again based on police and Commonwealth accounts, that Appellant engaged in bizarre behavior at an initial abortive arraignment hearing, rendering her unfit to proceed, and speculated as to whether Appellant may have been under the influence of illegal drugs:

McKnight said [Appellant] was arrested at 2:25 a.m. today at her home on a solitary count of criminal homicide, and was taken to district court for preliminary arraignment, but was determined to be unfit for the hearing.

\* \* \*

"She was incoherent," Detective Charles Shoemaker said. "She didn't respond to any of the questions posed by the justice." Shoemaker and McKnight had no comment on the possibility that some sort of controlled substance might have prevented her statement to the court.

*Id.* The article then recounted, as derived from the affidavit of probable cause in support of Appellant's arrest warrant, the details of the investigation, and offered evocative biographical information about Sementelli, including his history in the community, the fact that he was a World War II veteran, the fact that his wife had died several years prior, causing him to suffer from loneliness, and the fact that his murder had orphaned his dog: [11]

11. Although we do not question the propriety of the Express' memorialization of Sementelli's life or its reports of the murder's impact on his loved ones or the community in general, we note that its articles doing so, when juxtaposed against those implicating Appellant as his killer, counsel toward a finding that they are inherently inculpatory and inflammatory.

Sementelli was described as a "get-up-and-go person ... very independent," by acquaintances.

He was often seen in town with his constant companion of 10 years, a small, black dog named Muffy. Reports indicate that the dog was found in the house alive, and has been turned over to the Clinton County SPCA animal shelter.

\* \* \*

Sementelli, a native of Lock Haven, attended Catholic grade school and went to the old St. Agnes school before leaving after the 11th grade to accept a job at a local industry. He worked at a variety of occupations throughout his life, including stints as a taxi driver and postal service worker, and jobs at local paper mills.

He was a World War II veteran of the U.S. Army, and had been stationed at Pearl Harbor, Hawaii, during the infamous attack by the Japanese on that island harbor.

He was the subject of a full-page Express article that appeared on Dec. 7, 2002, on the 61st anniversary of the Pearl Harbor attack.

His wife, Betty, died in late 2002, and afterward, Sementelli had made a habit of visiting with friends his own age across town, to hold the loneliness at bay.

*Id.* Finally, the article offered starkly different biographical information concerning Appellant, noting that "Court records"—the reference to which may well have suggested to readers that Appellant had a prior criminal record—indicated Appellant "was unemployed," "financially responsible for a 4–year–old child," and "last employed in telephone sales." *Id.*

The very next day, the Express' coverage continued in the form of two front-page articles concerning the crime. The first, "Neighbors shocked: Death of City man stuns friends," further memorialized Sementelli and reporting on the crime's impact on his neighbors and the community at large. *See* Lana Muthler and Courtney Crissey, "Neighbors shocked: Death of City man stuns friends," *Express,* Apr. 2, 2003 (Appellant's Brief app. at 147). In its first two paragraphs, the article described Sementelli's military service and analogized

the crime and its perpetrator to the Imperial Japanese forces who attacked Pearl Harbor during World War II:

> LOCK HAVEN—Sixty-one years ago, a brave young American soldier survived the devastating Japanese bombing of Pearl Harbor. He loved to talk about that time and was proud of serving his country.
>
> Last week that same man, now old, tired and lonely, met the enemy again. This time it was on his own turf. And this time, Jim Sementelli didn't live to talk about it.

*Id.* The article went on to report Sementelli's neighbors' thoughts concerning the crime, Sementelli, and Appellant's prosecution:

> Neighbors of the 83–year–old veteran, found dead in his ... home Monday night, are shocked. More alarming to them is that another one of their neighbors—[Appellant]—has been charged with Jim's murder.
>
> They knew Jim as a friendly old fellow whose greatest joy in the past few years was walking his little black dog up and down the alley, sitting on his porch when the weather cooperated, making rounds to the local service clubs to sign the daily log, and taking an occasional fishing trip to Canada.
>
> They knew [Appellant], too, but only in passing. She lived in a third-floor apartment [across an alley.]
>
> And they knew something was wrong last week when they didn't see Jim for several days, noticed his car wasn't parked in its usual spot, the blinds were drawn on the windows of his home, and daily newspapers were piling up on his porch.

*Id.* The article continued, reporting two individual neighbors' impressions of Sementelli, and their views of Appellant, noting, *inter alia*, that, while Sementelli lay murdered in his home, Appellant celebrated her daughter's birthday:

> "[Sementelli] never bothered anyone. He was a nice guy. I talked to him almost every day. I just thought he went away for a couple of days," Schroeder said ... "It's hard to believe that he was killed in his home ... and by her,"

Schroeder said, saying he didn't know anything had happened until police vehicles filled the normally quiet street Monday night.

"I knew [Appellant] ... to see her, but that's about all. I don't think Jim knew her either. He probably said "hi" when he saw her. He was friendly and talked to everyone," Schroeder continued.

Both [another neighbor,] Greninger and Schroeder saw [Appellant] last Saturday afternoon in her backyard, four days after she allegedly killed Jim with a hatchet, then stole his car and $500 in quarters.

"He was lying over there dead and she was over here having a birthday party for her daughter," Greninger said, shaking his head back and forth, still wondering how this could have happened in his back yard.

"She asked me if I wanted a piece of birthday cake," Greninger said," I said, "no thanks," and asked her if she'd seen Jim. She just answered 'no' and walked away.

Schroeder said he had the same invitation to join the birthday party from [Appellant].... He also declined.

*Id.* Finally, the article explored the impact on an anonymous friend of Sementelli from the neighborhood, holding out the crime as part of the decline of a theretofore peaceful residential community:

"I just can't believe what's happened here in my neighborhood. And ... to think it was this girl who lived right here ... it's really making me think about it more," he continued.

"I shared my garden with Jim. And, I often sat on his porch on summer nights talking with Jim. I guess I won't be doing that this year," the older gentleman continued, sadness in his voice as he spoke of his friend.

"If you're going to say anything about Jim, make sure it's nice, because that's how he was ... nice," he said softly as the conversation ended and he walked slowly down the

sidewalk in this quiet residential area where things like this aren't supposed to happen to people like Jim.

*Id.*

The day's second article reported in greater depth on Appellant's earlier failed arraignment and further reported that she had proceeded to another abortive arraignment hearing. *See* Jim Runkle, "Suspect again unfit for her arraignment," *Express,* Apr. 2, 2003 (Appellant's Brief app. at 149). The article, which featured a photograph of Appellant, in handcuffs and correctional garb, being led by sheriff's deputies from the courtroom, and which again recounted the Commonwealth's expressed theory of the case, sensationally painted Appellant as unhinged and inhuman, noting her behavior at her first attempted arraignment as volatile and describing her behavior at her second hearing as "zombie-like":

> With a great deal of assistance from county sheriff's deputies, [Appellant] appeared in a zombie-like state as she was led into the district justice's office for the second time Tuesday, shortly after 2 p.m. Throughout the brief court appearance, she sat motionless, leaning up against a wall, her thick, dark brown hair blocking her face as she looked to the floor.
>
> The reaction was apparently a far cry from the first visit to the office shortly after her arrest at 2:35 a.m., when [District Justice] Sanders suggested she put on an emotional and physical display that warranted the second appearance.

*Id.* The article also revealed what the Express had theretofore only implied: that Appellant had a prior criminal record. Specifically, the article noted that, when Appellant arrived at the arraignment hearing, "Public Defender Stephen C. Smith, who has represented [Appellant] in her past brushes with the law," met with her and anticipated being appointed as counsel. *Id.* Finally, the article implied that, at least in District Justice Sanders' view, Appellant's volatile behavior was dangerous, noting that District Justice Sanders told Attorney Smith to "move his chair a safe distance from [Appellant]" to avoid injury. *Id.*

Two days later, on April 4, Appellant was successfully arraigned, and the Express published another front-page article. *See* Jim Runkle, "Murder suspect arraigned," *Express*, Apr. 4, 2003 (Appellant's Brief app. at 150). The article reported that, although Appellant's previously-described "zombie-like" behavior had not changed, District Judge Sanders had gone ahead with the proceeding, arraigning Appellant and appointing Attorney Smith as counsel. *Id.* Thereafter, the article again recounted the Commonwealth's essential theory of the case as explained at the joint police/Commonwealth press conference.[12]

The next day, the Express continued its coverage, publishing another front-page article reporting that a test of Appellant's mental competency might delay her preliminary hearing. *See* Jim Runkle, "Sementelli case: Psych evaluation might delay hearing," *Express*, Apr. 5, 2003 (Appellant's Brief app. at 151). Thereafter, the Express elaborated at length on Appellant's prior criminal history in Clinton County:

A check of local criminal records indicates that [Appellant] was arrested twice before in Clinton County, and that she pleaded guilty and was sentenced in both cases.

On Feb. 1, 2002, ... she was involved in a forced entry at an apartment, in which a couch, loveseat and four pillows valued at $1,100 were stolen. That theft was initiated, court records say, because one of the other players needed quick money to pay off a drug debt, and figured the furniture would turn up some cash.

[Appellant] was sentenced to serve four to 23 months on a conspiracy charge in that case.

In the other criminal prosecution, she pleaded guilty to conspiracy to commit insurance fraud in July of 2001, and was sentenced to serve 20 days to 23 months in the Clinton County Correctional Facility.

Records indicate that on June 21, 1999 ... [Appellant] and several accomplices took her 1994 Geo Prism out into the

12. The same day, the Record published an article reporting on the accounts given at the joint press conference as well.

country, attempted to set it afire and extensively damaged it. She then reported that the car was stolen and collected an insurance settlement from All-[S]tate Insurance Co[.] In her latest arrest this week, [Appellant] is charged with criminal homicide, first-, second-, and third-degree murder and theft.

*Id.* The article then again reviewed the Commonwealth's essential theory of the case, as derived from the affidavit of probable cause in support of Appellant's arrest and outlined at the joint press conference. *Id.*

Thereafter, the matter lay dormant for a period, until, on April 13, an unknown assailant or unknown assailants fired shots at Gaines' home, and the Express published an article reporting that fact and linking it to Gaines' role in the prosecution:

WILLIAMSPORT—Three shots were fired late Friday evening at the Williamsport home of a woman who has provided information about a criminal homicide in Lock Haven.

City police are investigating the shooting incident, which occurred at the home of [Gaines]. Gaines is a prosecution witness in last month's slaying of [Sementelli].

Police said shots were fired about [sic] 11 p.m. at the property, which is owned by the Lycoming County Housing Authority. Police responded at 3 a.m. and discovered several bullet holes in the residence. Nobody was hurt during the episode.

Police have declined to discuss the case and will only say that the investigation is continuing.

"Shots fired at murder witness' home," *Express*, Apr. 14, 2003 (Appellant's Brief app. at 148). Thereafter, the article again reviewed the Commonwealth's essential theory of the case as derived from its earlier reports. *Id.*[13]

Three days later, on April 17, the Express published two new side-by-side, front-page articles about the investigation

---

**13.** The Record covered the shooting in similar fashion. *See* Mark Sohmer, "Somebody shoots at witnesses [sic] house," *Record,* Apr. 14, 2003 (Appellant's Brief app. at 191).

and Appellant's prosecution. The first reported the basis for and results of a police search of Mathis' apartment that revealed significant evidence consistent with Gaines' account of the night of the murder, tying that evidence in with the Commonwealth's extant, previously published allegations. *See* Philip A. Holmes, "Search sheds new light on Sementelli murder case," *Express*, Apr. 17, 2003 (Appellant's Brief app. at 152–53). The second reported that the District Court had "set aside an entire day"—May 22, 2003—for Appellant's preliminary hearing, and then proceeded to once more review the Commonwealth's extant theory of the case:

> [Appellant] is accused of using a small silver-colored hatchet to kill the 83–year–old Sementelli in his home across the alley from hers, the night of March 25. Arrest records allege [Appellant] killed Sementelli because she wanted to steal his car and sell it. She also is alleged to have stolen $510.25 in quarters from his home.

> Sementelli was found dead in the living room of his home by city police after Shanee ... Gaines of Williamsport, [Appellant]'s acquaintance, told Lycoming County emergency communications personnel that she had knowledge of a murder in Lock Haven and directed them to [a] man's address, according to the arrest records.

> Gaines said [Appellant] came to her house, wearing rubber gloves that appeared blood-stained.... Gaines said she and [Appellant] then drove to Lock Haven in Sementelli's car, viewed the corpse and returned to Williamsport, where they exchanged the quarters [Appellant] said she had stolen for larger currency.

> A search warrant just released this week now indicates a third woman was in the car with Gaines and [Appellant].

Jim Runkle, "Preliminary hearing for Shonda Walter set," *Express*, Apr. 17, 2003 (Appellant's Brief app. at 152–53).

On April 29, the Express published another front-page article wherein, based largely on the affidavit of probable cause in support of the search of Mathis' home, it implicated Mathis as an accomplice to the crime, recounting the extant

police theory that Appellant solicited Mathis' help in cleaning up the crime scene and discussing the search in great detail. *See* Jim Runkle, "Warrant implicates third woman: Attempt to hide crime alleged in death of city man," *Express,* Apr. 29, 2003 (Appellant's Brief app. at 155–56). The same day, it published a second-page article reporting that Appellant faced allegations of violating parole arising from the murder. *See* Jim Runkle, "Murder suspect Walter appears for parole hearing on earlier charges," *Express,* Apr. 29, 2003 (Appellant's Brief app. at 156). The article again offered the details of the murder's discovery and investigation, including Gaines' statement, and repeated the Express' earlier recitation of Appellant's criminal record. *Id.*

Thereafter, the Express' coverage faced a brief lull, until, on May 23, Appellant proceeded to a preliminary hearing, after which the charges against her were bound over for court, and the Express published another front-page article, detailing the witnesses' often graphic testimony in depth:

LOCK HAVEN—[Appellant] repeatedly and brutally struck at her elderly victim with a hatchet and told him to "just die," as he begged for his life, according to a witness for the prosecution.

The graphic testimony of Shanee Gaines, autopsy photographs and a police investigator's description of the crime scene, offered the most detailed description yet of the attack that led to the death of James Sementelli[.]

Jim Runkle, "Murder suspect bound over on all charges," *Express,* May 23, 2003 (Appellant's Brief app. at 157 & 164). The article then reiterated the Commonwealth's basic theory of the case, noted that Public Defender Smith, who was Appellant's "attorney in two past brushes with the law," was serving as counsel, and delved at length into Gaines' testimony:

Gaines took the stand at [Appellant]'s hearing Thursday ... testifying that [Appellant] provided her with a blow-by-blow description of the episode just hours after the killing. After the attack, police say, [Appellant] traveled to Williamsport, where she met with Gaines.

Gaines testified that she and another woman, Michelle Mathis, accompanied [Appellant] on a trip back to Sementelli's home on the night he was killed. On that trip, Gaines said, [Appellant] talked about the crime and her plans for disposing of the body. Gaines said [Appellant] also remembered leaving a cigarette butt in the toilet at Sementelli's home, and wanted to make sure it was flushed away.

\* \* \*

Gaines said she came forward because her friend, Aaron Jones, Williamsport [sic], had been stopped by police while driving the Sementelli car and she didn't want Jones to be arrested for something that [Appellant] had done.

Gaines also indicated that she received word that [Appellant] had planned a murder. That word came from her friend, Michelle Mathis, Gaines said.

"She (Mathis) said that [Appellant] called her and said she was going to kill a man in Lock Haven to get his car and sell it, and she wanted to know if there's any place she could hide a body," Gaines testified.

\* \* \*

Gaines said she was at the Mathis home the day of the murder, when [Appellant] turned up on the doorstep with what appeared to be a blood spatter on her forehead. "She asked me was Michelle there, and I said you might as well come in 'cause I already know all about it," Gaines said.

*Id.* The article then recounted the attack on Gaines' home, noting it occurred "after she provided police with information about the Sementelli death," noting that she had been placed in witness protection, and continuing its coverage of her testimony:

"She said she was going to back the car into the garage, put the body in the trunk, go to a secluded area and set it on fire," Gaines said, "She said he invited her over for a movie and was going to get a glass of water . . . She turned and she struck him. He turned around and grabbed her arm and she hit him again. She cut his ear almost completely off. Then she hit again (across the bridge), cutting part of

his nose off. She said she hit again and heard his skull crack."

"She said he asked her why she was doing it, and she said because she can," Gaines testified. "He asked her if she would call 911 and she said 'No ... Just die ... Die.'"

Gaines told police that all three women went to the victim's home intending "to get rid of the body," but that Mathis and she were unable to go through with it. "I couldn't touch the body," Gaines said. "I went outside to the car and Michelle was right behind me." She said [Appellant] went upstairs while they were in the home and came back down with a large quantity of quarters.

It was while Gaines and Mathis were inside the car, Gaines said, that she dropped a cigarette and discovered the hatchet beneath the driver's seat.

On the trip back, she said, [Appellant] stopped along [a rural road] and threw the hatchet over a guiderail and into the woods.

*Id.* The article also detailed Appellant's mother's testimony at the hearing, specifically noting that it was consistent with the Commonwealth's extant theory of the case:

[Appellant]'s mother, Judith Walter, was called to the stand by the prosecution to help build a theory of her daughter's possible motive for killing her neighbor.

She told the court that her daughter owed between $9,000 and $10,000 in student loans, and still had $800 outstanding in fines and court costs for her previous appearances in court. A court payment was due at the time of Sementelli's death, she said, and [Appellant] "didn't have the money. She wasn't working. She was worried that if she didn't make a payment they would take her to jail."

Mrs. Walter testified to her daughter's comings and goings from the day Sementelli was believed to have died to the day his body was discovered. None of those details appeared to contradict the prosecution's theory of events.

*Id.* The article further recounted Aaron Jones' testimony concerning Appellant's alleged trips to Philadelphia to attempt to sell the car:

> Aaron Jones testified that he, Mathis, [Appellant], and Gaines traveled to Philadelphia in Sementelli's Camry in order to sell it. Jones said he believed the car was [Appellant]'s, and had been told she obtained it from her father.
>
> "She said it was hers," Jones said. "I kept asking her why she was selling ... She said it was her daddy's car and her pop passed. She said it held bad memories."
>
> Jones said the group arrived in Philadelphia on March 29, but too late to take the auto to a chop shop. They looked around for anybody who wanted to buy the car, but were unable to find a customer.
>
> The crew returned to Williamsport, and Jones said [Appellant] loaned him the vehicle. He was driving the Camry when the vehicle was stopped ... by police officers, who issued him a citation, took the keys and impounded the vehicle.

*Id.*

The Express' coverage continued in similar tenor at virtually every significant stage of the prosecution up to and including Appellant's requests for a change of venue. On June 9, 10, and 14, the Express published articles detailing difficulties that District Attorney McKnight was having with obtaining Gaines' cooperation as a witness, and, in each article, again repeated the Commonwealth's essential theory of the case. *See* Jim Runkle, "Prosecutor wants bail for key witness in murder case," *Express*, June 9, 2003 (Appellant's Brief app. at 158); Jim Runkle, "Witness may face prison," *Express*, June 10, 2003 (Appellant's Brief app. at 159); Jim Runkle, "Bail motion withdrawn in Sementelli case," *Express*, June 14, 2003 (Appellant's Brief app. at 159).[14]

14. The Record also covered the Commonwealth's efforts to secure Gaines' appearance. *See* "Shanee Gaines bail hearing," *Record*, June 10, 2003 (Appellant's Brief app. at 182).

As noted *supra,* on June 16, the Commonwealth filed notice of its intent to seek the death penalty, and, the next day, the Express published another front-page article indicating as much, and again recounting the Commonwealth's theory of the crime, as well as the fact that Appellant had had prior "brushes with the law." *See* Jim Runkle, "D.A. seeking death penalty in Sementelli murder," *Express,* June 17, 2003 (Appellant's Brief app. at 161).[15] On June 24, the Express published another front-page article covering Appellant's not-guilty plea, once more recounting the Commonwealth's theory of the case. *See* "Murder suspect pleads not guilty," *Express,* Jun. 24, 2003 (Appellant's Brief app. at 162).[16] Later, while Appellant and the Commonwealth were engaged in pretrial discovery and preparation, the Express reported that Mathis had been arrested in connection with a collateral robbery, that Attorney Smith suggested that Gaines and Mathis had framed his client for murder, and, again provided the Commonwealth's theory of the case. *See* Jim Runkle, "D.A. responds to Mathis arrest," *Express,* Oct. 21, 2003 (Appellant's Brief app. at 163).

On November 18, the next public development in the case, Judge Williamson set an initial trial date, and the Express, again on its front page, reported to that end, again recounting the Commonwealth's basic theory of the crime. *See* Jim Runkle, "Attorney: Walter murder case set for March," *Express,* Nov. 18, 2003 (Appellant's Brief app. at 165). On December 16, Appellant proceeded to a hearing on Appellant's Motion to Dismiss Alleged Aggravating Circumstances and Petition for Writ of Habeas Corpus With Respect to Count V, and the Express published yet another front-page article

15. The Record published an article reporting that the district attorney had filed a notice of aggravating circumstances and repeating the essential facts of the case, including that "[Appellant] also took over $500 in quarters from the residence [and] is charged with first, second and third degree murder." Mark Sohmer, "Shonda Walter ... could be looking at the death penalty," *Record,* Jun. 19, 2003 (Appellant's Brief app. at 184).

16. The Record also covered Appellant's not guilty plea in an article wherein it also detailed the Commonwealth's theory of the case. "Shonda pleads not guilty," *Record,* Jun. 24, 2003 (Appellant's Brief app. at 183).

detailing the proceedings and the Commonwealth's theory of the case. *See* Jim Runkle, "Defender challenges DA's claim," *Express*, Dec. 16, 2003 (Appellant's Brief app. at 167–68). On January 9, 2004, the trial court denied the motion, and the Express covered that denial, again detailing the Commonwealth's theory. *See* Jim Runkle, "Judge tosses motion to turn away death penalty in murder case," *Express*, Jan. 9, 2004 (Appellant's Brief app. at 169).

Three days later, on January 12, the *Express* reported that, according to a police affidavit of probable cause seeking to search Appellant's home, Appellant had confessed to the crime, expressing concern to a cellmate that certain implicating items might be found in her home, and revealing that the ensuing search had indeed recovered those items:

> LOCK HAVEN—A search warrant issued Friday describes local murder suspect [Appellant] admitting to another inmate at the Clinton County Correctional Facility that she killed her neighbor, and worried about several items of damaging evidence she might have left in her own home afterward.

> [Appellant], 24, is accused of using a silver hatchet last March to kill her neighbor, 83–year–old James Sementelli, at his home ... and stealing his car and $510.25 worth of coins.

> She was arrested in early April and remains in prison without bail on charges of first-, second-, and third-degree murder.

> On Friday, city police pointed to a conversation [Appellant] had with another inmate at the prison as the reason for the new search of the home the young woman shared with her mother[.]

> After conducting the search, officers walked away with several small items they hope might bolster the commonwealth's [sic] criminal case, including a cordless telephone, a purple watch and a "shark" key chain/bottle opener.

\* \* \*

In the application for a search warrant, Detective Charles Shoemaker said he uncovered the possibility of new evidence through an interview last October with [Appellant]'s cellmate. The cellmate apparently told officers that when they were sharing a cell, [Appellant] disclosed to her that she had killed Sementelli.

The cellmate also told officers that [Appellant] had a cordless telephone with her at the time of the killing, and that when the phone rang, she answered the call while covered with a large amount of the victim's blood, according to the court document.

During this conversation between inmates, police said, [Appellant] also said she had stolen a shark key chain/bottle opener from Sementelli's house.

Police said [Appellant] expressed concern to the other inmate that the telephone and her watch might have been splattered with blood, and that the shark key chain might be found at her home and then used to tie her to murder. [sic]

All three items were found in [Appellant's] home and are being tested for trace evidence relating to the homicide of James Sementelli, police said.

Jim Runkle, "Warrant says Walter admits to murder," *Express,* Jan. 12, 2004 (Appellant's Brief app. at 170).

On January 29, with the parties engaged in pretrial preparation, the Express' coverage of the case took a new turn, focusing on the trial's impact on the public budget. After the Express inquired as to the amount the county would be paying, among others, Attorneys Smith and Bryant for serving as counsel, President Judge Richard Saxton issued a gag order prohibiting the release of that information. The same day, the Express reported on the story, and, in its coverage, noted that, *inter alia,* President Judge Saxton indicated that the trials would likely be costly:

"These trials are going to cost the county a lot of money," he added. "There's no doubt about it. . . . If I were on trial for my life, these are the two attorneys I'd want. They leave no stone unturned. We also have the death penalty to

consider. If that penalty occurs, the Supreme Court scrutinizes these matters very minutely."

Jim Runkle, "Gag order issued: Public to be kept in dark about cost of murder cases," *Express,* Jan. 29, 2014 (Appellant's Brief app. at 171–72). The following day, the Express published another two front-page articles on the topic, one reporting on estimated budget shortfalls, and the other reporting an attorney's suggestion that President Judge Saxton's order improperly kept the public in the dark as to the cost of the trials. *See* Jim Runkle, "Clash for Cash: Cost of murder trial could put county deep in the red," *Express,* Jan. 30, 2004 (Appellant's Brief app. at 173 & 175);[17] Jim Runkle, "Attorney: 'gag order' oversteps right to know," *Express,* Jan. 30, 2004 (Appellant's Brief app. at 173–74).

Three days later, Appellant compiled the foregoing articles and applied for a change of venue, and, unsurprisingly, the Express published a front-page article concerning the application for a change of venue, wherein it again retraced the Commonwealth's basic theory of the case. *See* Jim Runkle, "Change of venue sought in Walter case," *Express,* Feb. 4, 2004 (Appellant's Brief app. at 176).[18]

Finally, on July 12, 2004, Appellant filed her final supplemental application for a change of venue, attaching a letter to the editor from one of Sementelli's relatives wherein the relative expressed outrage that county commissioners were complaining about the cost of Appellant's trial, noting that the family had suffered and hoped for justice, and suggesting that the Commissioners seek restitution from Appellant upon her conviction to recoup the cost of her trial.

Based on the foregoing, we do not hesitate to hold that the pretrial publicity at issue here was inherently inflammatory and inculpatory in nature. As demonstrated above, these articles are replete with sensationalism and emotional appeals

17. This article also briefly recounted the Commonwealth's theory that Appellant used "a silver hatchet last March to kill her neighbor, 83–year–old James Sementelli, at the Sementelli home[.]" *Id.*

18. Appellant appended this article to her subsequent supplementary application for a change of venue.

painting Sementelli (albeit accurately) as a sympathetic war hero whose life was cut short by Appellant, whom it portrayed as an unproductive, volatile, conscienceless, drug-addled and "zombie-like" criminal, contained implications of Appellant's guilt, recounted revelations of her prior criminal record and admissions to the murder, and were derived largely from police and/or Commonwealth reports. These articles, in addition to the insinuation that Appellant's prosecution was burdening the county's financial budget, potentially requiring a tax hike, are precisely the type of reports that are likely to cause their readers to make up their minds to convict Appellant before the trial has begun.

Turning to whether these inherently prejudicial reports were sufficiently sustained and pervasive as to warrant a presumption of prejudice, we first note that, as detailed above, the Express' articles covered virtually every facet of Appellant's prosecution from her arrest to the date she sought a change in venue.[19] Moreover, Appellant submitted the uncontested affidavit of the Express' publisher that these articles, which were almost exclusively published on the Express' front page, reached approximately 9,400 individuals, households, and businesses. Combining that fact with the fact that, at the time, primarily rural, close-knit Clinton County had an adult population of approximately 31,194 persons, *see* United States 2010 Census, Clinton County Quick Facts, *available at http://quickfacts.census.gov/qfd/states/42/42035.html* (last visited Mar. 14, 2015), we think it a reasonable conclusion that a significant contingent of jury-eligible adults in Clinton County would have been exposed to the prejudicial reports.

■ Nevertheless, upon examination of the *voir dire* proceedings, we conclude that the 11–month period between the latest of the submitted publicity and Appellant's trial was sufficient to dispel any prejudice against her. *See Briggs,* 12

19. Appellant submits that the coverage continued throughout her prosecution, attaching additional articles foraying into similarly troubling areas. *See* Appellant's Brief at 27; *id.* app. at 75. She invites this Court to take judicial notice of their existence and their likely prejudicial effect. As Appellant failed to place the additional coverage before the trial court, we will not consider them now.

A.3d at 314 (noting that "a change of venue will ... not be compelled unless the defendant ... demonstrates that ... 'there was insufficient time between the publicity and the trial for any prejudice to have dissipated.'" (quoting *Tharp*, 830 A.2d at 529)). Although numerous prospective jurors were exposed to coverage concerning Appellant's case, only 33 of 300 prospective jurors (11%) indicated that they could not put the information aside and fulfill their duty to decide the case fairly and impartially. *See* N.T. Voir Dire I, 4/1/05, at 22; N.T. Voir Dire II, 4/1/05, at 18. As such, this case is markedly distinguishable from those cases wherein we have found sufficient fixed bias to allow for a presumption of prejudice, and, rather, is akin to those in which we have rejected such a conclusion. *Compare Cohen*, 413 A.2d at 1076 (finding abuse of discretion in failure to grant a change of venue where pretrial opinion poll demonstrated 57% of prospective jurors believed the accused was guilty and 53% of jurors were excused on the ground they had a fixed, irrevocable belief that the accused was guilty) *with Tharp*, 830 A.2d at 528–30 (finding no abuse of discretion in failure to grant a change of venue where 30% of prospective jurors had a fixed opinion that the accused was guilty); *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873, 877–78 (1975) (rejecting claim where 21% of prospective jurors admitted belief that defendant was guilty); *Commonwealth v. Hoss*, 445 Pa. 98, 283 A.2d 58, 61–64 (rejecting claim of presumptive prejudice where 19% of prospective jurors expressed belief in defendant's guilt); and *Briggs*, 12 A.3d at 311–18 (rejecting claim of presumptive prejudice where 12% of prospective jurors expressed belief in defendant's guilt). Appellant advances no argument distinguishing or offering us reason to revisit the implication of these decisions.

Thus, we find no abuse of discretion in the trial court's failure to grant the applications for a change in venue.[20]

20. Appellant again asserts, relying on broadside assertions of her entitlement to relief, that the trial court's failure to grant her application for a change of venue violated her rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 6, 9, 13, and 25 of the Pennsylvania Constitution. Appel-

Accordingly, Appellant is not entitled to relief with respect to her fourth issue.

### E. Notice Of Commonwealth's Intent to Call Witness Emma Thompson

■ In her fifth issue, Appellant contends she was not given sufficient notice of the Commonwealth's intent to call Emma Thompson, who corroborated testimony concerning Appellant's trips to the Philadelphia region for the purpose of attempting to sell Sementelli's car.

On March 18, 2005, the trial court entered a final discovery order requiring the Commonwealth and Appellant to submit witness lists within ten days, and the parties complied. Subsequently, at trial, the Commonwealth called Thompson to the stand, whereupon the following exchange occurred:

[ATTORNEY SMITH:] Your Honor, we need to approach a minute before this witness testifies. [at sidebar] Your Honor, as the Court knows, we have had a longstanding request for discovery of statements. We never received anything on this particular witness. She was never brought to my attention until a phone call from [the Commonwealth] Sunday.

[COMMONWEALTH:] Over the weekend.

[ATTORNEY SMITH:] Over the weekend.

[COMMONWEALTH:] No. Maybe Friday.

[ATTORNEY SMITH:] Friday, Saturday, Sunday.

[COMMONWEALTH:] Judge, and that is actually accurate because I never knew her full name. I couldn't locate her until recently because the only person who knew her name was Aaron Jones. And quite frankly, I couldn't understand him. I kept thinking he was saying Amanda. And that's why I had [another potential witness] Amanda Reed. That's why I finally made him take me to the home where the young lady used to live, and I found out her true name. And as soon as I did, I advised Counsel. He always knew there was another—this is the young lady

lant's Brief at 27. Appellant failed to raise these distinct claims below and fails to develop them in her brief, rendering them waived. Pa. R.A.P. 302(b); *Steele*, 961 A.2d at 797.

who was in the car with Shanee Gaines, Aaron, [Appellant], and Michelle Mathis. Her testimony is brief.

THE COURT: Did you have an opportunity to talk to her?

[ATTORNEY SMITH:] No. She was never—we never received any information other than a name, and I think—

[COMMONWEALTH:] A name and a number.

[ATTORNEY SMITH:] I never got a phone number or an address to get a name. And the reason why I got the name is she has the same name as an actress.

THE COURT: I don't think you're going to sink or swim on this witness. I'm going to overrule your objection.

N.T. Trial 4/12/05 at 41–43.

Citing, *inter alia*, *Palermo v. United States*, 360 U.S. 343, 362, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959), Appellant contends she was constitutionally entitled to advance notice of the Commonwealth's intent to call Thompson, and, at minimum, notice of Thompson's name and address. She contends the lack of earlier notice hampered her cross-examination of Thompson. Additionally, she contends that "Ms. Thompson's statement, which contained numerous incriminating statements purportedly made by Appellant, was subject to mandatory disclosure" pursuant to Pa.R.Crim.P. 573(B)(1)(b). She asserts that the Commonwealth could have more quickly learned of Thompson's identity, and faults the trial court for not providing her at least the opportunity to interview Thompson prior to her testimony. She contends the foregoing errors were not harmless, as Thompson's testimony "was vital to the prosecution and prejudicial to Appellant" in that it established her trips to Philadelphia via a witness who, unlike Gaines or Jones, was not herself accused of wrongdoing. Appellant's Brief at 39.

In its responsive brief, the Commonwealth notes that, contrary to Appellant's assertion, there is no constitutional right to advance notice of prosecution witnesses, observing that Appellant improperly relies on a non-precedential concurrence in *Palermo*, and claims the U.S. Supreme Court has rejected the notion that the constitution requires discovery in a crimi-

nal case. Commonwealth's Brief at 18 (citing *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) (quoting *Wardius v. Oregon*, 412 U.S. 470, 474, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973))); *Commonwealth v. Lambert*, 584 Pa. 461, 884 A.2d 848 (2005). The Commonwealth further notes that a criminal defendant "is not entitled to the disclosure of a witness's statement to police before the witness testifies on direct examination." Commonwealth's Brief at 17 (citing *Commonwealth v. Elliott*, 549 Pa. 132, 700 A.2d 1243, 1249 n. 14 (1997) (quoting *Commonwealth v. Ford*, 539 Pa. 85, 650 A.2d 433, 441 (1994))). Finally, the Commonwealth recounts its explanation at trial as to why it was not able to give notice of its intent to call Thompson sooner, and submits that, assuming the trial court erred in permitting her to testify, the error is harmless because Appellant fails to demonstrate what further investigation would have uncovered concerning Thompson's testimony.

In its opinion, the trial court explains as follows:

After reviewing the record, it does not appear to this Court that Thompson's testimony was improper. Defense counsel ... knew, prior to trial, the occupants of the vehicle on the trip to Philadelphia. Pre-trial hearings and statements, as well as testimony preceding Thompson's, disclosed [Appellant's] presence in the car on the trip. There was no element of surprise regarding Thompson's testimony and this Court found it did not necessitate additional preparation by [Appellant's] counsel.

We recognize that [Appellant] was unaware Thompson would testify at trial. However, ... the question of discovery and evidence lies with the court, and such discretion will not be reversed unless there is an apparent abuse of discretion. Upon reviewing the trial court record, and the testimony prior to and after Thompson's, we find there was no abuse of discretion. Allowing Thompson to testify was appropriate.

Trial Ct. Op., 9/24/13, at 14–15.

As a general matter, a trial court "may order the Commonwealth to allow the defendant's attorney to inspect and copy or

photograph ... the names and addresses of eyewitnesses" where the names and addresses are "material to the preparation of the defense, and ... the request is reasonable." Pa.R.Crim.P. 573(B)(2)(a). Likewise, "[i]f, prior to or during trial, either party discovers ... the identity of an additional witness ... such party shall promptly notify the opposing party or the court of the additional ... witness." Pa. R.Crim.P. 573(D).

As noted *supra*, on March 18, 2005, the trial court ordered the Commonwealth and the defendant to submit witness lists within 10 days. As established at trial, however, at that time, the Commonwealth was unaware of Thompson's name, much less that it would call her as a witness, and, upon learning her name, promptly disclosed it to Appellant. Moreover, even if we were to accept Appellant's proposition that she was constitutionally entitled to advance notice of Commonwealth witnesses, we note that she was given several days advance notice of the Commonwealth's intent to call Thompson to the stand, and offers absolutely no authority or analysis in support of her claim that this period of notice was inadequate. Moreover, tellingly, she offers no explanation of how, with more advance notice, she would have more effectively cross-examined Thompson. Accordingly, Appellant is not entitled to relief with respect to her fifth issue.

### F. Admission of Gruesome Photographs of Crime Scene and Autopsy

In her sixth issue, Appellant argues the trial court erred in admitting gruesome photos of the murder scene and Sementelli's autopsy: specifically, Commonwealth's Exhibits C–9, C–10, C–11, which depict Sementelli's body and/or the scene of the crime, and C–26, and C–27, autopsy photos which depict Sementelli's wounds. In its case-in-chief, the Commonwealth called Lock Haven Police Officer Keith Kibler, who testified to receiving Gaines' report from Lycoming County dispatchers and discovering Sementelli's body. In inquiring about how officers processed the crime scene, the Commonwealth indicated its intent to use a series of photographs arranged on poster

boards to illuminate Officer Kibler's testimony, prompting the following discussion, *in camera:*

[COMMONWEALTH:] The reason I believe we're back here is the Commonwealth has Officer Keith Kibler on the witness stand who was the first to enter the premises at [Sementelli's home]. I'm going to ask him to describe [proposed exhibits] C–9, 10, and 11, which are photo boards containing photographs of what he observed on scene. And Counsel, whom I've shown these photo boards, will object. And he's made known his objections to those and that which they depict.

\* \* \*

[COMMONWEALTH:] [Proposed exhibit] C–9 ... is a board with three, six, eight photographs on it, all various angles and portions of the body of the deceased and portions of the residence and the location in which the body was. That will be C–9.

THE COURT: All right.

[COMMONWEALTH:] [Proposed exhibit] C–10 similarly shows—it is a series of three, six, eight photographs as well also showing the deceased and various portions of his injuries and portions of the room in which he was found.

[ATTORNEY BRYANT:] We have no objection to C–11.

\* \* \*

[COMMONWEALTH]: ... These two will be 11 and 12.

\* \* \*

THE COURT: What do you have an objection on this, the standard?

[ATTORNEY BRYANT:] Your Honor, the only—and I can speak to that. I realize where the law is going. And [Attorney] Smith and I have discussed this at length in preparation. We were given, in fact, excellent discovery in this case. They gave us the color pictures, not just copies of them. And quite candidly, the pictures in black and white appear more Hitchcockian. These are pretty horrific. We realize that they are inflammatory. They

are what they are. We would ask that the Court minimize the number of pictures. We don't need, I think, for any probative value, this many pictures of this gruesome scene going out at this time.

\* \* \*

I mean, it's bad. But it's what we got.

[COMMONWEALTH:] Actually, if I may, Your Honor, I would argue probative to almost every one. Some of the duplicates show different positions, different portions of the body; and they address different issues that the Commonwealth needs to address, defensive wounds, proximity of the body to other blood areas, the nature of the injuries, and the length of the time the injuries were received is an issue in this case as well as opposed to immediately, fatal wounds. That's where the defensive wounds are important, Judge.

The law—and actually you were on—you were I think the law is pretty clear on this, Your Honor, that these have some probative value. We're not dealing with children. The jurors are adults.

THE COURT: I think that's probably true, but I'm still obligated to draw some line.

[COMMONWEALTH:] I have excluded many, many photographs, as Counsel well knows. There are close-ups which I specifically avoided unless they had a purpose, Your Honor. I did not put, by any means, the worst or most graphic photos; and I did not put any—this is a small fraction of the actual numbers taken—of the photos actually taken.

\* \* \*

[ATTORNEY SMITH:] And the other thing, before we go, Judge, is that when he, depending on how the Court rules, if pictures are then given to the jurors that . . . they not be set up during the entire duration of the trial for the jurors to stare at and continually be reminded.

\* \* \*

THE COURT: I assume that they'll publish them, and then they'll be withdrawn.

[COMMONWEALTH]: Put back.

THE COURT: That's what I would prefer.

N.T. Trial, 4/11/05, at 90–93.

Ultimately, the trial court admitted proposed Exhibit C–9 (as Exhibit C–9), excluded proposed Exhibit C–10, and admitted proposed Exhibits C–11 (as Exhibit C–10) and proposed Exhibit C–12 (as Exhibit C–11). The court then offered the following cautionary instruction:

Ladies and gentlemen, I'm going to anticipate the exhibit that we are allowing you to see. And I want to tell you, so that you are prepared, that it's a very gruesome photograph. It's not introduced for any purpose other than to depict the nature of the act, the scene, and the individual and so forth. And I would—I'm asking that you look at it as dispassionately as possible and keep in mind the reason that it is being introduced.

*Id.* at 95. The Commonwealth then elicited Officer Kibler's testimony concerning the processing of the crime scene.

Later in its case-in-chief, the Commonwealth called Dr. Wayne Ross, who was certified as an expert witness in forensic pathology, to testify as to various aspects of Sementelli's autopsy, and the manner and cause of death. In the course of Dr. Ross' testimony, the Commonwealth referenced Exhibit C–10, which Dr. Ross used to explain blood spatter and the nature of the attack. The Commonwealth also referenced Exhibits C–26 and C–27, each of which Dr. Ross used to explain Sementelli's wounds and the conduct of his autopsy.

Before us, Appellant argues the above exhibits were so gruesome, prejudicial, and cumulative that they should not have been admitted at trial. She notes that several of the photographs depict, *inter alia,* Sementelli's blood, sharp force trauma wounds, his severed ear, and his swollen tongue. She further notes that several of the pictures depict Sementelli in a state of six days' decomposition, and notes that such photographs have previously been held inadmissible at trial. She

further submits that many of the photographs were cumulative in nature, unnecessarily depicting their subject from various angles and degrees of magnification. She observes that, where the admission of gruesome photographs renders a trial fundamentally unfair, such admission violates the federal and state constitutional guarantee of due process of law. Finally, Appellant contends that, despite the above exchange, the Commonwealth's exhibits were left out to be viewed throughout the trial.

In its responsive brief, the Commonwealth argues as follows:

[T]he photographs were admitted for two specific purposes. They were used to illustrate the crime scene during the testimony of Officer Keith Kibler of the Lock Haven Police Department . . . and of Wayne Ross, M.D., relating to his expert opinions. . . . The evidentiary value of these photographs plainly outweighed the potential for prejudice, and the trial court properly allowed the Commonwealth to use them at trial.

Commonwealth's Brief at 20.

In its opinion, the trial court noted as follows:

After a review of the trial record and briefs, we conclude it was a correct decision to admit this evidence. We agree with the Commonwealth that the photographs enhanced the testimony of the police officer concerning the crime scene and the autopsy photographs gave visual credence to the expert testimony of the forensic pathologist.

Trial Ct. Op., 9/24/13, at 16.

Where a relevant photograph is "gruesome or inflammatory" and "likely to inflame the passions of the viewer," a trial court may admit it only if its "essentially evidentiary value . . . clearly outweighs the likelihood of inflaming the minds and passions of the jurors." *Commonwealth v. Lyons*, 622 Pa. 91, 79 A.3d 1053, 1069 (2013) (citing *Commonwealth v. Schroth*, 479 Pa. 485, 388 A.2d 1034, 1036–37 (1978)). Moreover,

[a] criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.

*Lyons*, 79 A.3d at 1069–70 (quoting *Tharp*, 830 A.2d at 531 (quoting *Commonwealth v. McCutchen*, 499 Pa. 597, 454 A.2d 547, 549 (1982))). In reviewing a trial court's admission of gruesome photographs, this Court reverses only for an abuse of discretion. *Lyons*, 79 A.3d at 1069.

First, having reviewed Commonwealth's Exhibits C–9, C–10, and C–11, we find no abuse of discretion in the trial court's admission thereof. Exhibit C–9, a poster board of photos depicting Sementelli's body as discovered by police, contains 8 photographs of Sementelli's body, reclined against his sofa, with several wounds to his face, head and body, and with blood stains on his face, head, shirt and pants, as well as a portion of a sofa, end table, loveseat, carpet, and wall.[21] Exhibit C–10, another poster board of photos depicting the scene after Sementelli's body was removed, depicts a multitude of blood stains in the living room. Finally, Exhibit C–11, yet another poster board of photos, depicts various portions of Sementelli's home in disarray, with emphasis on an entertainment center that appears to have been ransacked. As the Commonwealth and the trial court explain, these exhibits are highly probative of the nature of the attack and Sementelli's wounds, which in turn aided the jury in understanding Officer

21. We note that one of the photographs on Exhibit C–9 appears to have sustained water damage post-trial. Nevertheless, from the undamaged portion of photograph, it appears the photograph is consistent with the others, merely depicting Sementelli's body and the scene of the crime from a different angle, and the parties do not suggest otherwise.

Kibler's and Dr. Ross' testimony concerning the same, and the trial court reasonably concluded such relevance outweighed their likelihood of inflaming the passions of the jury. Additionally, prior to publishing the exhibits to the jury, the trial court issued the above-quoted cautionary instruction, which the jury is presumed to have followed. *See Commonwealth v. O'Hannon*, 557 Pa. 256, 732 A.2d 1193, 1196 (1999) ("Absent evidence to the contrary, the jury is presumed to have followed the trial court's instructions."). Furthermore, we note that Appellant made no objection to the admission of the crime scene photos on due process grounds, or to their continued exhibition during trial; thus, she waived her claims in this regard. Pa.R.E. 103(a)(2); Pa.R.A.P. 302(b).

Finally, with respect to Exhibit C–26, another poster board containing 8 photos demonstrating the wounds to Sementelli's arms and one depicting a wound to his neck, and Exhibit C–27 a stand-alone photograph portraying a wound on Sementelli's abdomen, Appellant failed to object to their admission; she thus waived any present challenge to their admission. Pa. R.E. 103(a)(2). Accordingly, Appellant is not entitled to relief with respect to her sixth issue.

## G. Preclusion of Flippen Statement

In her seventh issue, Appellant claims that the trial court erred in precluding her from presenting testimony from Frank Flippen, who, Appellant argues, would have testified that Michelle Mathis confessed to him that she committed Sementelli's murder.

As noted *supra*, on November 17, 2003, Appellant filed her Motion to Dismiss Alleged Aggravating Circumstances and Petition for Writ of *Habeas Corpus* regarding the Commonwealth's charge of theft by unlawful taking. Therein, Appellant challenged, under *Commonwealth v. Buck*, 551 Pa. 184, 709 A.2d 892 (1998) (permitting challenges to the Commonwealth's designation of cases as capital where there is no evidence supporting its allegations of aggravating circumstances), the Commonwealth's allegations that she committed the murder with the intent to steal Sementelli's car. *See*

Motion to Dismiss Alleged Aggravating Circumstances, 11/17/03, at 1–2; Petition for Writ of Habeas Corpus With Respect to Count V, 11/17/03, at 1–2. At the ensuing evidentiary hearing, Appellant called Flippen to testify regarding a conversation with Michelle Mathis, prompting the Commonwealth's objection that any such testimony would be inadmissible hearsay, and ultimately leading to following exchange:

> THE COURT: All right. What's your response . . . to [the hearsay] objection?

> [ATTORNEY SMITH]: [W]e believe that the testimony that Mr. Flippen would give would fall under an exception . . . [as] statements Michelle Mathis made . . . against her penal interest. . . .

> THE COURT: Well, all right. Stop there. What's your response[?]

> [COMMONWEALTH]: I don't know what it is, so I'd ask for an offer of proof, Judge.

> THE COURT: All right. What do you anticipate he is going to say?

> [ATTORNEY SMITH]: I would anticipate what he's going to say, based upon at least two face-to-face conversations that I had with Mr. Flippen, that Michelle Mathis is the one that went into the place and did this killing.

> THE COURT: How is that relevant to these two issues?

> [ATTORNEY SMITH]: It's relevant to these proceedings in the sense that the petition that we have filed alleges that the Commonwealth cannot prove that this felony occurred—you know, the theft of the automobile—prior to the killing and I certainly believe that we're entitled to present evidence on that issue.

> THE COURT: But *Buck* specifically says that that is not what you're entitled to do. You're not entitled to have any hearing or any review by the Court of the facts that the Commonwealth intends to rely on or the fact that the Commonwealth intends to rely on to establish the aggravating circumstances. You're only entitled to have the

> Commonwealth inquire of the District Attorney whether or not these facts exist—
>
> * * *
>
> THE COURT:—which [they] would seem to [based on certain preliminary hearing testimony].
>
> [ATTORNEY SMITH:] Well, I think if you look at the—what the matter is we're hearing right now, which is the habeas corpus petition on just the one count on the evidence was insufficient for the preliminary hearing.
>
> THE COURT: I'll sustain the objection.

N.T. Pretrial Hearing, 12/15/03, at 13–14.

Subsequently, on the second day of trial, Appellant filed a document titled "Argument on Proffered Testimony of Proposed Defense Witness Frank Leroy Flippen," to which she attached the transcript of an interview with Flippen, detailing his indications that Mathis confessed to him that she was the real killer, suggesting testimony to that effect would be admissible hearsay, and requesting a ruling prior to calling Flippen to the stand. However, Appellant did not raise the issue before the trial court, and never called Flippen to testify.

Before us, Appellant contends that the trial court "erred in barring the admission of Michelle Mathis's statement admitting that she was the actual killer." Appellant's Brief at 44. Appellant contends the aforementioned filings preserved her claim for purposes of appellate review, and that Flippen's testimony was admissible hearsay under Pa.R.E. 804(b)(3) (providing for the admission of testimony regarding statements by unavailable declarants against the declarants' interests when made under circumstances indicating the statements' reliability); *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (holding that hearsay rules should not be mechanistically applied in a manner that infringes upon the due process right to present a defense); or Pa.R.E. 806 (providing for the admission of hearsay statements challenging the credibility of the declarants of previously admitted hearsay statements), in light of Gaines' testimony,

discussed above, that Mathis implicated Appellant in the crime.

Contrary to Appellant's argument, the trial court never, in fact, precluded her from calling Flippen to the stand. First, regarding her pretrial motions, it is clear the court sustained the Commonwealth's objection to the testimony on the ground that Appellant was not entitled, pursuant to *Buck*, to adduce her own evidence in support of her attacks on the Commonwealth's alleged aggravating circumstances, *see Buck*, 709 A.2d at 896 ("If ... evidence exists to create a factual dispute regarding whether the aggravating factor(s) exist, the defendant's motion should be summarily denied."), and not on the ground that the testimony would be inadmissible at trial. Moreover, although Appellant did file her "Argument on Proffered Testimony of Proposed Defense Witness Frank Leroy Flippen" in an attempt to obtain a ruling that the testimony was admissible, the trial court never ruled on this motion, and she failed to force the issue by, for example, calling Flippen to testify. Thus, as the trial court never precluded Appellant from calling Flippen to testify, her claim that it erred in doing so necessarily fails.[22]

## H. "Life Means Life" Instruction

In her eighth issue, Appellant contends that the trial court erred in failing to give an instruction to the jury that, in Pennsylvania, a sentence of life imprisonment carries no possibility of parole, claiming that she was entitled to one on numerous grounds.

22. In her supplemental brief, Appellant contends, citing *Viener v. Jacobs*, 834 A.2d 546, 552 (Pa.Super.2003), that the trial court's failure to rule on her request regarding Flippen's testimony "functioned as a denial" of the same. Appellant's Supplemental Brief at 12. In *Viener*, a shareholder litigation case, the Superior Court opined that, where a shareholder requested to *exclude* evidence in pretrial motions *in limine*, but where the trial court never ruled upon the motions, and where the testimony was in fact presented at trial, it would "consider the issues raised within the [m]otions preserved." *Viener*, 834 A.2d at 552 n. 4. Regardless of the soundness of this proposition, it does not apply herein, as Appellant filed a motion to permit, not exclude, testimony.

As noted *supra*, on November 1 and 3, 2004, five months before trial, Appellant filed two documents entitled "Defendant's Challenge to Capital Proceedings" and "Defendant's Amended Challenge to Capital Proceedings," wherein, *inter alia*, she requested, without resort to meaningful legal analysis, that the trial court "[i]nstruct the [j]ury as [to] the [d]efinition of [l]ife [i]mprisonment at all [l]evels of the [p]ending [p]roceedings." Defendant's Challenge to Capital Proceedings, 11/1/04, at 1; Defendant's Amended Challenge to Capital Proceedings, 11/3/04, at 1. The record does not demonstrate that Appellant sought or the trial court rendered a definitive ruling with respect to these pleadings.

Before us, Appellant contends that she was entitled to a "life means life" instruction on various grounds, and that the trial court's failure to provide one violated her rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 9, and 13 of the Pennsylvania Constitution. Appellant's Brief at 49.

In opposition, the Commonwealth argues, *inter alia*, that Appellant failed to request a "life means life" instruction at trial, or object to the omission of the same from the charge to the jury, rendering the claim waived. *See* Commonwealth's Brief at 25 (citing Pa.R.Crim.P. 647(B) ("No portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate.")).

We agree with the Commonwealth. Initially, we note that, in the above-quoted pleadings, Appellant vaguely requested an instruction "at all [l]evels of the [p]ending [p]roceedings," and identified various reasons such an instruction may be warranted. *See* Defendant's Challenge to Capital Proceedings, 11/1/04, at 1–4 (requesting instruction "when the issue of future dangerousness of the defendant arises"; "throughout this case"; "at all times"; "at all stages of the proceedings"; and "during voir dire, and at all other appropriate times"); Defendant's Amended Challenge to Capital Proceedings, 11/3/04, at 1–3 (requesting instruction "when the issue of future dangerousness of the defendant arises"; "throughout

this case"; "at all stages of the proceedings"; and "during voir dire, and at all other appropriate times"). Moreover, as the Commonwealth contends, Appellant failed to request a "life means life" instruction at trial and made no objection to the trial court's jury charge. Under such circumstances, we find Appellant's claim to be waived. *See* Pa.R.A.P. 302; Pa. R.Crim.P. 647(B); *see also Commonwealth v. Pressley*, 584 Pa. 624, 887 A.2d 220, 223–25 (2005) (holding that, at the time of Appellant's trial, a defendant must, at minimum, submit proposed jury instructions to preserve claim for purposes of appeal). Accordingly, Appellant is not entitled to relief with respect to her eighth issue.

### I. Prosecutorial Conduct at Penalty Phase Hearing

 In her ninth issue, Appellant claims that the Commonwealth engaged in improper questioning and commentary at her penalty-phase hearing, violating her rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 9, 13, and 25 of the Pennsylvania Constitution. Appellant's Brief at 55.

At the penalty-phase hearing, Appellant called Jennifer Brininger, one of her former schoolmates and friends, who testified as to their relationship, her recollection of Appellant's school experience, and how Appellant served as a confidant for her while her son had a kidney transplant. On cross-examination, the following exchange occurred:

[COMMONWEALTH:] Did you ever discuss with the Defendant the murder which she committed?

[BRININGER:] No.

[ATTORNEY SMITH:] Objection, Your Honor. It's beyond the scope of redirect.

THE COURT: Overruled.

[COMMONWEALTH:] Pardon me?

[BRININGER:] Sometimes.

[COMMONWEALTH:] You did?

[BRININGER:] Yes.

[COMMONWEALTH:] Did she ever express any remorse to you for what she'd done?

[BRININGER:] She never told me that she had did it.

[COMMONWEALTH:] So you just kind of talked about it, generally?

[BRININGER:] Right.

N.T. Penalty Phase Hearing, 4/19/05, at 25.

Later, Appellant called Linn Talbot, Appellant's high school English teacher, who testified to her being a good student, with no disciplinary problems, and further testified that, about a year after Sementelli's murder, she visited Appellant in prison, and the two developed a religious kinship. On cross examination, the Commonwealth asked Talbot, "[y]ou would agree that the first step to salvation is an admission of your sin, would you not?" *Id.* at 39. She agreed. *Id.*

In its summation, the Commonwealth began by speaking to the jury about its duty, as follows:

[T]he question that you must answer is a strictly legal question, aggravating outweighing mitigating.

And I say that because this room, on more than one day and this case in more places than this room, has been quashed with pain and tears. There's no question about that. We've seen some of those recently. They have not been the only ones shed. Mrs. Walter has been not the only one to shed them. The Sementelli family has shed them as well.

And no one should ask you, and I wouldn't ask you, not to have sympathy for all parties here on the part of [Appellant]. Just do not let that rule your decision because that's not what should happen.

This is a difficult task for Counsel, for myself, and for you. I'm not asking for sympathy for myself. This is a course I've chosen, and this is the task I have before me. I will say to a certain extent that I understand the responsibility you have because the Commonwealth has a responsibility. I, as its representative, have a responsibility as Defense Counsel has a responsibility.

And sometimes you feel that your responsibility requires you to do what amounts to dragging more pain in front of twelve people. That's what it amounts to. And just so maybe something that can inform the decision, it has to be a legal one.

I'll tell you a little something ... I've done this for—I've stood in front of many juries in matters where a life has been lost.

And at a certain point after having done it for a while, you know how you come home from work, and men more than women—women have a purse—but at the end of the day and you take stuff out of your pockets because it's been weighing your pocket in your jacket down and your pants down? And you take that stuff out. You feel better. You take your coat off because you want to get that stuff out of your pocket.

And after a while, after a while of doing this, after murder cases, murder cases, murder cases, you come home at the end of the day and you empty your pockets out and they're never empty because you feel as if you've got souls in your pocket. And it's a burdensome thing.

And again, I'm not asking for your sympathy. I'm just trying to inform your appreciation of the importance of the legal matter you have before you. Because in a way, that's something you'll have. You'll have a responsibility. But after a while, you just can't—you feel like you can't take another soul in your pocket. But there's one before us now. But that's James Sementelli's.

It's a burden. It's a burden that hasn't left this room because he deserves the only thing that we have the power to give him. Money, gone. House, gone. Life, gone. Muffy, gone. All gone. The thing that survives Jim Sementelli other than the memories of his family, the grief of those who loved him, the pain that's been caused by the acts of [Appellant], the only thing that truly survives is his right to have justice done on his behalf, his right to have justice imposed upon his murderer. That's what survives him.

So you have a decision to make, aggravating and mitigating. And that's all that matters legally. I'm sorry for the philosophical excursion. Legally speaking, you have a decision to make about aggravating and mitigating circumstances.

N.T., Penalty Phase Hearing, 4/19/05 at 46–48. Finally, later in its summation, the Commonwealth made the following remark:

[Appellant's mother], she has another daughter who has chosen a different path. So it was not her upbringing that caused her to be this way.

*Id.* at 50.

Appellant contends the above questioning and summation constitute prosecutorial misconduct which impermissibly equated her lack of remorse with guilt; exploited her exercise of her privilege against self-incrimination; invited the jury to consider numerous prejudicial factors beyond the alleged aggravating and mitigating factors—including an uncharged aggravating factor that the murder was perpetrated by means of torture—in determining whether to impose the death penalty; and was based on facts not of record.

As the Commonwealth argues, and despite Appellant's claim to the contrary, she failed to raise an objection to the Commonwealth's questions to Brininger on the ground that they constituted prosecutorial misconduct, failed to raise any objection to the Commonwealth's questioning of Talbot, and made no objection to its summation. Accordingly, her claims are waived. *See* Pa.R.E. 103(a)(1); *Rivera,* 983 A.2d at 1229.[23]

23. Appellant asserts that she preserved her claims of prosecutorial misconduct via a post-sentence motion and/or that, even if she failed to preserve the claims, they are reviewable under the auspices of this Court's statutory duty to review death sentences. *See* 42 Pa.C.S. § 9711(h)(3). This Court has rejected both approaches. *See Rivera,* 983 A.2d at 1229 (requiring a contemporaneous objection to preserve a claim of improper prosecutorial remark and rejecting a claim raised fifteen minutes later, after a recess and prior to the trial court's jury charge); *Commonwealth v. Martin,* 627 Pa. 623, 101 A.3d 706, 734–35 (2014) (rejecting claim not raised by timely, specific objection in the trial court and raised under the auspices of 42 Pa.C.S. § 9711(h)(3)).

As a result, Appellant is not entitled to relief with respect to her ninth issue.

## J. Constitutionality of Death Penalty

In her tenth and final issue, Appellant claims that the death penalty, *per se*, violates the Eighth Amendment to the United States Constitution and Article I, Section 13 of the Pennsylvania Constitution because it "no longer comports with our sense of decency." Appellant's Brief at 63. Appellant notes that a line of United States Supreme Court decisions has dramatically diminished the constitutionally permissible applications of the death penalty, and contends "[t]he ultimate conclusion is inescapable; the death penalty is on a path to its own extinction and has now reached the point where it is no longer constitutionally sustainable." Appellant's Brief at 63–65 (citing, *inter alia*, *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (requiring individualized assessments of particular offender and facts of the particular case in imposing sentence of death); *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (forbidding imposition of death penalty for rape of an adult); *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (forbidding imposition of death penalty on individuals who are insane); *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (forbidding imposition of death penalty on individuals who were "mentally retarded" at the time they committed murder); *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (forbidding imposition of death penalty on individuals who were juveniles at the time they committed murder); and *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (holding counsel ineffective in failing to investigate and present mitigation evidence)). Appellant further notes that, since 2004, four states—New York, New Jersey, New Mexico, and Illinois—have judicially or legislatively abandoned the imposition of the death penalty, joining 13 other states that have no death penalty for murder.

Finally, Appellant points to what she deems international condemnation of the death penalty. In support, Appellant notes that (1) "Article 2 of the Charter of Fundamental Rights of the European Union prohibits the use of capital punishment"; (2) several United Nations non-binding resolutions calling for a moratorium on executions; (3) the United States imposes the fifth most executions of any nation in the world; and several international treaties—the *International Covenant on Civil and Political Rights, International Convention on the Elimination of All Forms of Racial Discrimination, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, American Convention on Human Rights*, and the *Vienna Convention on Consular Rights*"—disfavor capital punishment. Appellant's Brief at 66–67.

In its responsive brief, the Commonwealth cites to numerous decisions in which this Court has rejected challenges to Pennsylvania's death penalty statute on the ground that it violates the federal and state constitutional prohibitions on cruel and unusual punishments. *See* Commonwealth's Brief at 29–30 (citing, *inter alia, Commonwealth v. Koehler*, 558 Pa. 334, 737 A.2d 225 (1999); *Commonwealth v. Crews*, 552 Pa. 659, 717 A.2d 487 (1998)). It posits:

Neither this Court nor the Supreme Court of the United States has suggested that the death penalty is unconstitutional *per se* .... [Appellant] first claims that the courts have narrowed the number of cases eligible for the death penalty. The mere fact that certain cases have been removed from the ambit of capital litigation shows that the death penalty continues to be a viable and proper sentence for those ... who qualify as the "worst of the worst."

[Appellant] also points to a purported trend toward more stringent enforcement of procedural rights and the effective assistance of counsel. In this bizarre argument, [she] presumes that such safeguards did not exist prior to the issuance of opinions on the topic and that therefore the Commonwealth should eliminate capital punishment. The fact is that capital cases have always been viewed as the

most serious cases and have been given close consideration. Citing cases in which procedural irregularities were found to exist hardly constitutes a basis for finding that there is a trend toward more serious enforcement of procedural rights.

[Appellant] next points to a purported legislative trend toward abolition of the death penalty. This argument also makes no sense. Given that the overwhelming majority of states allowed the imposition of the death penalty, the fact that a few states have eliminated the death penalty shows that the only possible trend was away from the death penalty.

Lastly, [Appellant] points to 'international condemnation' of the death penalty. . . . She cites a number of international treaties to which the United States is either not a signatory or which are unenforceable in the United States. Of course, it may also be said that the fact that other states and countries have abdicated their role in imposing a just sentence is no reason for Pennsylvania to do so.

Commonwealth's Brief at 30–31. In its opinion, the trial court likewise notes that this Court has repeatedly rejected constitutional challenges to the Pennsylvania death penalty statute.

As a preliminary matter, Appellant does not claim that any of the United States Supreme Court cases she cites bar the imposition of the death penalty against her—*e.g.*, she does not claim she is insane, or that she was mentally retarded or under the age of 18 when she committed murder. Instead, she appears to raise a claim that contemporary standards of decency have evolved to such a degree that there is now a consensus against the death penalty *per se. Cf., e.g., Atkins,* 536 U.S. at 304, 122 S.Ct. 2242 (finding a consensus against the execution of offenders who were mentally retarded at the time of their offenses where, *inter alia,* almost all states banned or failed to conduct executions of such offenders, where the bulk of professional and religious organizations opposed such executions, and where the court discerned no reason to disagree with the consensus); *Roper,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (finding a consensus

against the execution of offenders who were juveniles at the time of their offenses, relying on *Atkins*, where, *inter alia*, almost all states banned or failed to conduct such executions, where the international community disparaged such executions, and where the court discerned no reason to disagree with that consensus). However, we do not view Appellant's argument, relying on a minority of states which have abolished the death penalty and a few select international legal documents condemning or calling for restrictions on the death penalty, as sufficient to warrant our reassessment, at this juncture, of the constitutionality of the death penalty *per se*.

## III. CONCLUSION

Accordingly, the judgment of sentence of death is **AFFIRMED.**

Justices EAKIN, BAER and STEVENS join the opinion.

Chief Justice SAYLOR files a dissenting opinion.

Chief Justice SAYLOR, dissenting.

Six years after the conclusion of Appellant's direct appeal from her judgment of sentence, the majority undertakes to consider a serial direct appeal, which was authorized by a PCRA court based upon the agreement of Appellant and the Commonwealth. Appellate jurisdiction, however, cannot be created by agreement or consent. *See Commonwealth v. Saunders*, 483 Pa. 29, 32, 394 A.2d 522, 524 (1978).[1] What is required, in the absence of an affirmative demonstration of prejudice, is a supported judicial finding that Appellant suffered a deprivation of her right to appellate counsel so severe as to be tantamount to a complete denial of counsel. *Accord Commonwealth v. Halley*, 582 Pa. 164, 171–73, 870 A.2d 795, 800–01 (2005); *cf. United States v. Cronic*, 466 U.S. 648, 659 & n. 25, 104 S.Ct. 2039, 2047 & n. 25, 80 L.Ed.2d 657 (1984). The PCRA court, however, entertained no evidence and made

1. The Court has also indicated that, where appellate jurisdiction is lacking but the litigants do not raise this concern, it should be considered *sua sponte*. *See Commonwealth ex rel. Ransom Twp. v. Mascheska*, 429 Pa. 168, 170, 239 A.2d 386, 387 (1968).

no comparison between the claims resolved six years ago and those which she sought to raise in this serial appeal. Instead, the court merely alluded to circumstances which were well known to this Court at the time of Appellant's initial appeal, namely, that such appeal had been poorly presented and that the claims raised during its course were waived and/or meritless. *See Commonwealth v. Walter,* 600 Pa. 392, 392–406, 966 A.2d 560, 560–68 (2009).[2] Although I have repeatedly expressed my grave concerns about the quality of the attorney stewardship in capital cases in this Commonwealth, *see, e.g., Commonwealth v. Rivera,* 631 Pa. 67, 135–36, 108 A.3d 779, 820 (2014) (Saylor, J., dissenting), I do not support consideration of serial direct appeals by agreement as a solution.[3]

Ten years have passed since Appellant's trial, and glaring post-conviction issues remain concerning the adequacy of her attorneys' stewardship at her capital trial. In this regard, Appellant's guilt-phase counsel made no opening statement to the jurors, presented no evidence, and delivered a rambling series of closing remarks in which he repeatedly conceded Appellant's guilt,[4] while focusing more upon his own circum-

2. Notably, in this regard, the majority finds that Appellant's present claims also are unpreserved and/or meritless.

3. According to the majority, my position "conflates the rationale for the PCRA court's order with *its* jurisdiction to grant relief—here, the reinstatement of direct appeal rights." Majority Opinion, at 184–85 n. 5, 119 A.3d at 261 n. 5 (emphasis adjusted). In point of fact, my remarks go to the jurisdiction of *this Court* to consider the merits of a serial direct appeal. A post-conviction court's award of *nunc pro tunc* relief in a form that gives rise to jurisdiction in another court—which jurisdiction simply would not exist in absence of the relief—is obviously a unique and multi-faceted subject.

 I believe that jurisdiction *in this Court* which does not otherwise exist simply cannot be created by agreement and without a proper, supported substantive basis. While the majority criticizes my position as being contrary to "longstanding principles of order finality and appellate jurisdiction," Majority Opinion, at 184–85 n. 5, 119 A.3d at 261 n. 5, the majority cites to no principles or cases in which this Court has previously, on any sort of developed reasoning, recognized jurisdiction *on its own part* to consider a serial direct appeal grounded upon mere agreement by the litigants. Indeed, I find the majority's position in this regard to be extraordinary.

4. *See, e.g.,* N.T., Apr. 18, 2005, at 6 (reflecting the following comments to the jury by Appellant's guilt-phase trial counsel: "How could you

stances and idiosyncrasies than upon her representation.[5] Appellant has already filed a developed post-conviction petition challenging that stewardship. Accordingly, I would dismiss this serial direct appeal and remand for a post-conviction hearing, factual findings, and legal conclusions on Appellant's broader post-conviction claims so that the state-level review finally may be concluded. In this regard, I would also direct the common pleas court to proceed with a sense of urgency, which, obviously, has been lacking previously.

defend a woman who gives a man 66 whacks with a hatchet? That is my duty."); *id.* at 8 ("When I was appointed, I told [Appellant] there is no way I am going to argue that you should be found not guilty."); *id.* at 10–13 (reflecting counsel's repeated characterization of his client as "the low hanging fruit"); *id.* at 14 ("We conceded all [of the Commonwealth's] bad facts because they are inescapable; and we look at them with that ineluctable sense that only comes to you, wow, am I looking at a train wreck as a defense attorney?").

5. *See, e.g.*, N.T., Apr. 18, 2005, at 2 ("The fact that I can speak to a small group or a large group and put sentences together and not—don't have a speech impediment is nice; but it's more a reflection of the fact that I almost became a Methodist minister and then realized that the Methodist church didn't need an Elmer Gantry."); *id.* at 3 ("[M]y sister and I thought it would be really neat to dance like the little kids on [a] t.v. show ... but my father was a World War II fighter pilot and was then in the Korean War and flying jets. And he picked me up with his Air Force jacket with the wings and Captain bars and blah, blah, blah."); *id.* at 9 ("[A]nd as you've noticed in my voir dire to you—and I can't change. I wish I could. No, I don't wish I could. The hell with that. I am who I am. I do have a rather bizarre sense of humor. And I can find something—if you wanted something nice, witty, or I thought was witty, or funny."); *id.* at 12 ("[I]f the District Attorney wants to wave the hatchet, he is more than welcome to because were I in his shoes, I would be running around like I was playing cowboys and Indians and I had a real prop."); *id.* at 15 ("And I do want to tell you, and I'm not blowing smoke, but when they asked me [to represent Appellant], as I've said somewhat facetiously, I was everybody's favorite 14th choice."); *id.* at 15 (asserting that the prosecutor "is the kind of advocate like the British have where one day you're the prosecutor and next week they show up and the regiment says, hey, Joe, you're to go over and defend such and such. You're not prosecuting. We can work either sides. We're not whores.... They did it when John Adams defended people who were guilty as sin, and you'll do it again. Thank you.").